UNIVERSAL HEALTH SERVICES, INC., Appellee,

v.

PENNSYLVANIA PROPERTY AND CASUALTY INSURANCE GUARANTY ASSOCIATION, Appellant.

Superior Court of Pennsylvania.

Argued Nov. 16, 2004.

Filed Sept. 26, 2005.

Lise Luborsky, Philadelphia, for appellant.

Richard F. McMenamin, Philadelphia, for appellee.

BEFORE: HUDOCK, TODD, and BECK, JJ.

OPINION BY TODD, J.:

¶ 1 In this declaratory judgment action, Pennsylvania Property and Casualty In-

surance Guaranty Association ("PPCIGA") appeals the May 5, 2004 order denying its motion for summary judgment and entering summary judgment in favor of Universal Health Services, Inc. ("UHS"). In this case of first impression, we are asked to determine whether claims under a "reporting tail" endorsement to a claims-made policy, first reported more than 30 days after an insurer's insolvency, are obligations of PPCIGA under the Pennsylvania Property and Casualty Insurance Guaranty Association Act, codified at 40 P.S. §§ 991.1801–991.1820 (the "Guaranty Act"). For the following reasons, we find that they are, and we affirm.

¶ 2 This action arises as a result of the liquidation of PHICO Insurance Company ("PHICO"). Prior to the liquidation, UHS was insured by PHICO under a professional liability policy for claims related to UHS's operation of various medical facilities. PHICO was declared insolvent and placed in liquidation by order of the Commonwealth Court on February 1, 2002 (the "Liquidation Order") pursuant to the Insurance Department Act, codified at 40 P.S. §§ 211–221.63 (the "Liquidation Act"). The Liquidation Order, as we will discuss more fully below, triggered obligations of PPCIGA to provide statutory coverage to

UHS to the extent provided under the Guaranty Act.

¶ 3 UHS's policy with PHICO was a claims-made policy[1] and was initially issued on January 1, 1998 and remained in effect until January 1, 2002 (the "Policy Period"). At the time of purchase, UHS also purchased a "reporting tail" endorsement of unlimited duration,[2] which took effect at the end of the Policy Period. The purpose of the reporting tail was to provide coverage for claims made after the claims-made policy expired for events that took place during the Policy Period.

¶ 4 UHS received several claims based on events that took place during the Policy Period, but those claims were first reported to UHS more than 30 days after the determination of insolvency. PPCIGA denied coverage on these claims, asserting that its obligations to provide coverage extended no further than to claims reported within 30 days after the determination of insolvency, despite the reporting tail endorsement.[3] As a result, PPCIGA maintained that its obligations had ended. UHS, on the other hand, contended that because of the unlimited reporting tail, there is no end date to PPCIGA's obligations under its policy and the Guaranty Act. In essence, UHS contended that the

1. There are two basic types of liability insurance policies: claims-made and occurrence. A claims-made policy protects the insured only against claims first made during the life of the policy, regardless of when the event out of which the claim arose occurred; by contrast, an occurrence policy protects the insured from liability for any act or occurrence done while the policy is in effect regardless of when the claim is made. *See Home Ins. Co. v. Law Offices of Jonathan DeYoung, P.C.*, 32 F.Supp.2d 219, 224–25 (E.D.Pa.1998); 7 Couch on Insurance § 102:20 (3d ed.).

2. Tail coverage, also referred to as an extended reporting period or as a reporting tail, is purchased in conjunction with, or before the expiration of, a claims-made policy and ex-

tends the time within which a claim may be made after the cancellation or expiration of a particular claims-made policy; such coverage provides insurance protection for acts, errors, or omissions that occurred while the initial claims-made policy was in effect, so long as a claim is asserted before the expiration of the tail period. *See Home Ins. Co.*, 32 F.Supp.2d at 224; 7 Couch on Insurance § 102:26 (3d ed.).

3. As we discuss more fully below, the statutory cutoff date for claims in the Guaranty Act is prior to, or within 30 days after, an insurer's insolvency. *See* 40 P.S. § 991.1803(b)(1)(i).

reporting tail converted the claims-made policy into an occurrence policy, claims under which it is undisputed PPCIGA would provide coverage.

¶ 5 UHS subsequently filed this declaratory judgment action against PPCIGA.[4] The parties filed cross-motions for summary judgment. The trial court granted UHS's motion, and denied PPCIGA's motion, concluding that the reporting tail policy essentially converted UHS's claims-made policy into an occurrence policy, warranting PPCIGA's coverage of UHS's claims. PPCIGA's appeal followed, and on appeal it asks whether, under the Guaranty Act, a claim made more than 30 days after a liquidation order under a tail endorsement of a claims-made policy of an insolvent insurer is an obligation of PPCIGA. (*See* Appellant's Brief at 4.) It also asks whether the insurance commissioner's decision to allow such claim is binding. (*Id.*) We address these questions together.

 ¶ 6 Our standard of review in a declaratory judgment action is narrow. *O'Brien v. Nationwide Mut. Ins. Co.*, 455 Pa.Super. 568, 573, 689 A.2d 254, 257 (1997). We review the decision of the trial court as we would a decree in equity and set aside factual conclusions only where they are not supported by adequate evidence. *Id.* We give plenary review, however, to the trial court's legal conclusions. *See id.* Furthermore, our standard of review of an order granting or denying a motion for summary judgment is well established:

> We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to a judgment as a matter of law will summary judgment be entered. Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion.

*Pappas v. Asbel*, 564 Pa. 407, 418, 768 A.2d 1089, 1095 (2001) (citations omitted).

¶ 7 PPCIGA is an agency created by the Pennsylvania legislature under the Guaranty Act to provide limited statutory benefits when there is a covered claim arising under the insurance policy of a property or casualty insurer deemed to be insolvent. *Carrozza v. Greenbaum*, 866 A.2d 369, 375 n. 6 (Pa.Super.2004), *appeal granted in part*, 2005 WL 1939440 (Pa. Aug.12, 2005); *see generally* 40 P.S. §§ 991.1801–991.1820. Among the purposes of the Guaranty Act is "[t]o provide a means for the payment of covered claims under certain property and casualty insurance policies, to avoid excessive delay in the payment of such claims and to avoid financial loss to claimants or policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1).

¶ 8 The Act requires every insurer, as a condition of doing business in the Commonwealth, to participate in PPCIGA, thereby spreading out over all member insurance companies the risk of loss due to the insolvency of any one insurer. *Carrozza*, 866 A.2d at 385. When an insurer becomes insolvent, PPICGA becomes a "guarantor" with a limit of liability of

---

4. Two individual defendants in this action were dismissed in response to preliminary objections to UHS's amended complaint.

$300,000 per claimant for a "covered claim", defined as an unpaid claim "which arises out of and is within the coverage" of the policy of the insolvent insurer. *See id.* at 375 n. 6; 40 P.S. § 991.1802.[5] Specifically, PPCIGA is obligated "to pay covered claims existing prior [to] the determination of the insolvency, arising within thirty (30) days after the determination of insolvency" or before the policy is expired or replaced. 40 P.S. § 991.1803(b)(1)(i).[6] At issue in this case is whether UHS's claims were claims "existing" prior to PHICO's insolvency or "arising" within 30 days of the Liquidation Order.

¶ 9 Because of the manner in which the Guaranty Act interacts with the Liquidation Act, however, also at issue is whether UHS's claims are "covered claims." The Liquidation Act, with the aim of protecting insureds, creditors, and the public generally, empowers the insurance commissioner to, *inter alia*, petition the Com-

---

5. The term "covered claim" is defined in full as follows:

(1) An unpaid claim, including one for unearned premiums, submitted by a claimant, which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy to which this article applies issued by an insurer if such insurer becomes an insolvent insurer after the effective date of this article and:

(i) the claimant or insured is a resident of this Commonwealth at the time of the insured event: Provided, That for entities other than an individual, the residence of a claimant or insured is the state in which its principal place of business is located at the time of the insured event; or

(ii) the property from which the claim arises is permanently located in this Commonwealth.

(2) The term shall not include any amount awarded as punitive or exemplary damages; sought as a return of premium under any retrospective rating plan; or due any reinsurer, insurer, insurance pool or underwriting association as subrogation recoveries or otherwise.

(3) The term shall not include any first-party claim by an insured whose net worth exceeds twenty-five million ($25,000,000) dollars on December 31 of the year prior to the year in which the insurer becomes an insolvent insurer: Provided, That an insured's net worth on that date shall be deemed to include the aggregate net worth of the insured and all of its subsidiaries as calculated on a consolidated basis.

40 P.S. § 991.1802.

6. This section provides, in relevant part:

(b) The association shall have the following powers and duties:

(1) (i) To be obligated to pay covered claims existing prior [to] the determination of the insolvency, arising within thirty (30) days after the determination of insolvency or before the policy expiration date if less than thirty (30) days after the determination of insolvency or before the insured replaces the policy or causes its cancellation if he does so within thirty (30) days of the determination. Any obligation of the association to defend an insured shall cease upon the association's payment or tender of an amount equal to the lesser of the association's covered claim obligation or the applicable policy limit. Such obligation shall be satisfied by paying to the claimant an amount as follows:

(A) An amount not exceeding ten thousand ($10,000) dollars per policy for a covered claim for the return of unearned premium.

(B) An amount not exceeding three hundred thousand ($300,000) dollars per claimant for all other covered claims.

(ii) In no event shall the association be obligated to pay a claimant an amount in excess of the obligation of the insolvent insurer under the policy or coverage from which the claim arises. Notwithstanding any other provisions of this article, a covered claim shall not include any claim filed with the association after the final date set by the court for the filing of claims against the liquidator or receiver of an insolvent insurer.

(2) To be deemed the insurer to the extent of its obligation on the covered claims and, to such extent, shall have all rights, duties and obligations of the insolvent insurer as if that insurer had not become insolvent.

40 P.S. § 991.1803(b)(1)-(2).

monwealth Court for an order authorizing the commissioner to rehabilitate or liquidate an insolvent insurer. *Foster v. Rockwood Holding Co.*, 158 Pa.Cmwlth. 258, 264, 632 A.2d 335, 338 (1993) (citing 40 P.S. §§ 221.1, 221.15, 221.20). Once an insurer is declared insolvent and ordered into liquidation, the Act provides mechanisms and procedures through which insureds and creditors may submit claims on the estate of the insolvent insurer. *Maleski by Chronister v. Corporate Life Ins. Co.*, 163 Pa.Cmwlth. 49, 57, 641 A.2d 7, 11 (1994) (citing 40 P.S. § 221.38). The insurance commissioner, acting as statutory liquidator, then makes recommendations for the approval or rejection of such claims to the Commonwealth Court. *Id.* (citing 40 P.S. §§ 221.31, 221.40, 221.41, 221.43). Resolution of the instant case implicates the Liquidation Act because Section 221.21 of the Liquidation Act allows insurance policies of a liquidated insurer to remain in effect only for 30 days after an order of liquidation, at the latest.[7] PPCIGA argues that since the PHICO policy, including the reporting tail, was terminated by operation of Section 221.21 30 days after the Liquidation Order, UHS's claims, being reported after this 30–day period, were not "covered claims" under Section 991.1802 of the Guaranty Act because the claims could not be ones which "arise[ ] out of and [are] within the coverage" of a terminated policy.

■ ¶ 10 UHS initially submitted its claims to the insurance commissioner acting in her role as the statutory liquidator of PHICO pursuant to the Liquidation Act. *See* 40 P.S. 221.20(c).[8] In proceedings in which PPCIGA was not a party, the commissioner initially determined that the UHS's claims were not "covered claims" against PHICO in liquidation under the Liquidation Act, because the right to make reporting tail claims was cancelled by the order liquidating PHICO. The commissioner later reversed her decision, however, holding in her Notice of Claim Determination that the claims were not cancelled and that they were covered claims under the Guaranty Act. (*See* Notice of Claim Determination (Exhibit 9 to UHS's Motion for Summary Judgment) (hereinafter "Notice of Claim Determination"), at 1–5 (R.R. 166a–170a).)[9] The

---

7. Section 221.21 provides:

 **Continuance of coverage**

 All insurance in effect at the time of issuance [of] an order of liquidation shall continue in force only with respect to the risks in effect, at that time (i) for a period of thirty days from the date of entry of the liquidation order; (ii) until the normal expiration of the policy coverage; (iii) until the insured has replaced the insurance coverage with equivalent insurance in another insurer or otherwise terminated the policy; or (iv) until the liquidator has effected a transfer of the policy obligation pursuant to section 523(8), whichever time is less.

 40 P.S. § 221.21 (footnote omitted).

8. This subsection provides in part:

 An order to liquidate the business of a domestic insurer shall appoint the commissioner and his successors in office liquidator and shall direct the liquidator forthwith to take possession of the assets of the insurer and to administer them under the orders of the court. The liquidator shall be vested by operation of law with the title to all of the property, contracts and rights of action and all of the books and records of the insurer ordered liquidated, wherever located, as of the date of the filing of the petition for liquidation.

 40 P.S. 221.20(c).

9. It is "well settled that when the courts of this Commonwealth are faced with interpreting statutory language, they afford great deference to the interpretation rendered by the administrative agency overseeing the implementation of such legislation." *Winslow-Quattlebaum v. Maryland Ins. Group*, 561 Pa. 629, 635, 752 A.2d 878, 881 (2000). Accordingly, "our courts will not disturb administrative discretion in interpreting legislation with-

Commonwealth Court granted the commissioner's petition to confirm UHS's claim, while explicitly noting that it was not asserting jurisdiction over PPCIGA, as it was not a party to those proceedings.

¶ 11 With this factual, procedural, and statutory background in mind, we begin our analysis with the language of the UHS policy at issue. The policy provides that PHICO agrees

> to pay on behalf of the insured all sums which the insured shall be legally obligated to pay as damages because of bodily injury or property damage caused by a medical incident, or because of a staff privileges incident, which occurs on or after the Initial Effective Date stated in the Declarations and for which claim is reported to PHICO during the policy period.

(Healthcare Providers Liability Policy (Exhibit 2 to UHS's Motion for Summary Judgment) (hereinafter "Policy"), at 14 (R.R. 45a).) It is undisputed that the Policy Period was January 1, 1998 until January 1, 2002. The policy further provides that "[a] claim shall be considered made when the insured has reported it to PHICO" (Policy, at 24 (R.R. 55a)), thus it is clear that the policy is a *claims-made* policy.

¶ 12 The reporting tail policy endorsement, which UHS purchased when it purchased the claims-made policy, provides that PHICO agrees to pay for damages caused by a "medical incident which occurs on or after the Initial Effective Date stated in the Declarations and prior to the Effective Date stated in the Declarations, and for which claim is reported to Company on or after the Effective Date stated in the Declarations." (Extended Reporting Period Coverage (Exhibit 7 to UHS's Motion for Summary Judgment) (hereinafter "Tail Policy"), at 2 (R.R. 161a).) It is undisputed that the reporting tail policy was effective January 1, 2002, and covered any "medical incident" which occurred during the period of the claims-made policy, the Policy Period. But for PHICO's insolvency and liquidation, it is undisputed that UHS's claims at issue herein were covered by the reporting tail endorsement.

¶ 13 We now address the Guaranty Act and the issue of whether, under 40 P.S. § 991.1803(b)(1)(i), UHS's claims were claims "existing" prior to PHICO's insolvency or "arising" within 30 days of the insolvency date. PPCIGA notes that the PHICO policy was a claims-made policy, providing that "[a] claim shall be considered made when the insured has reported it to PHICO," (Policy, at 24 (R.R. 55a)), and therefore emphasizes that "[t]he policy tailors the requirement of reporting to the trigger of coverage." (Appellant's Brief at 14). As a result, PPCIGA argues that UHS's claims, having been *reported* to PHICO much later, did not "exist" or "arise" within the time specified in the Guaranty Act: "[t]he claims are not obligations of [PPCIGA], even if they would have been PHICO's." (*Id.* at 15).

in an agency's own sphere of expertise absent fraud, bad faith, abuse of discretion or clearly arbitrary action." *Id.* at 636, 752 A.2d at 881. Herein, the Insurance Department is generally charged with the execution of the laws of this Commonwealth with regard to insurance. *See* 40 P.S. § 41. Moreover, the Guaranty Act specifically provides that the operations of PPCIGA shall be subject to the regulation and supervision of the insurance commissioner. 40 P.S. 991.1804. Accordingly, we conclude that the insurance commissioner's interpretation of the Guaranty Act and the Liquidation Act with regard to UHS's claims is entitled to substantial consideration, even though we recognize that the insurance commissioner's decision, which was approved by the Commonwealth Court, is not technically binding on PPCIGA since it was not a party to those proceedings.

¶ 14 UHS counters that its purchase of a reporting tail for its PHICO policy essentially converted the PHICO claims-made policy into an occurrence policy. PPCIGA has conceded, by way of the deposition of its designated representative, that, for an occurrence policy, as long as the alleged negligence triggering the claim occurred during the policy period, PPCIGA would cover that claim whether or not the claim was filed by the end of the 30–day period.[10] (Deposition of Stephen F. Perrone (Exhibit 7 to UHS's Motion for Summary Judgment), 9/15/03, at 91–93 (R.R. 134a–136a).) That is, for an occurrence policy, claims "exist" under the Guaranty Act regardless of when they are reported, because the event triggering coverage in an occurrence policy is the negligent act, not the reporting of the claim. (*See id.*) PPCIGA maintains, however, that a claims-made policy with a reporting tail is not the equivalent of an occurrence policy because for a claims-made policy, the reporting of the claim triggers coverage; thus, a claim can only "exist" or "arise" under the Guaranty Act when they are reported.

¶ 15 PPCIGA's argument in favor of its position consists largely of conclusory hypotheticals in which it contrasts the facts of the instant case with distinctly different factual scenarios.[11] Regardless, we see no functional difference between a claim made under an occurrence policy and a claim made under a claims-made policy with a reporting tail, where the claim is made during the reporting tail period, and we find there is substantial support for the notion that a claims-made policy with a reporting tail *is* the functional equivalent of an occurrence policy. *See Paternaster v. Lee*, 581 Pa. 28, 863 A.2d 487, 489 n. 3 (2004) (equating the two types of policy formulations and noting in dicta that "in essence, the tail policy would have converted his claims policy into an occurrence policy."); *Arad v. Caduceus Self Ins. Fund, Inc.*, 585 So.2d 1000, 1001 (Fla.App. 1991) ("As to future claims from incidents arising during the insured period, then, a physician who purchases claims-made with a tail achieves the equivalent of occurrence coverage."); *Byrne v. Joliet Med. Group, Ltd.*, 1992 WL 159178, *3 (N.D.Ill.1992) ("In general, tail coverage, or a reporting endorsement, converts the claims made coverage into occurrence based coverage for the policy period."); *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1367 (Colo.1993)

10. This position is consistent with the Commonwealth Court's interpretation of the now-repealed Pennsylvania Insurance Guaranty Act, 40 P.S. §§ 1701.101–1701.605 (repealed) ("PIGA"), the predecessor to the Guaranty Act. The Court held that under PIGA, whose "existing" and "arising" language was substantially the same as the language in 40 P.S. § 991.1803(b)(1)(i) at issue in this case, PIGA was required to assume responsibility for a claim under an occurrence policy which was filed after the 30–day bar date as long as the tortious act occurred within the policy term. *See Pennsylvania Osteopathic Med. Ass'n v. Foster*, 134 Pa.Cmwlth. 368, 379, 579 A.2d 989, 995 (1990), *aff'd without opinion*, 530 Pa. 198, 607 A.2d 1073 (1992).

11. For example, PPCIGA provides the following hypothetical:

Another more complex example also demonstrates that a claim does not exist or arise under a claims-made policy until it is made. If the insured had purchased a tail with a one-year period, and the liquidation was ordered more than thirty days before the end of the tail period, [PPCIGA] would have had no obligation for a claim made more than thirty days after the liquidation order, even if the claim was reported within the one-year tail period. That would be so even if the occurrence or medical incident took place before the liquidation order and during the initial policy period. Again, the claim arose for purposes of the [Guaranty] Act when it was made, not on the date of the occurrence or medical incident. (Appellant's Brief at 13–14.)

("When an insured's coverage under a claims-made policy is terminated, or not renewed, the insured may purchase coverage for claims that arose during the policy period but were subsequently asserted. The subsequent coverage is called a 'tail policy' or 'retroactive reporting coverage' and in effect converts a claims-made policy into an occurrence policy."); Couch on Insurance § 102:26 (3d ed.) ("[Tail] coverage . . . is purchased from the first insurer and covers future claims made for incidents occurring during the time of the claims-made coverage. In effect, such coverage turns claims-made coverage into occurrence coverage."). The insurance commissioner came to this same conclusion in her Notice of Claim Determination regarding UHS's claims: "The purpose of a reporting tail endorsement is to provide the policyholder with the equivalent of coverage under an occurrence policy for the time period covered by the expired claims-made policy." (Notice of Claim Determination, at 3.)

¶ 16 Indeed, in *Paternaster, supra,* our Supreme Court approved regulations promulgated by the director of the Pennsylvania Medical Professional Liability Catastrophe Loss Fund ("CAT Fund")[12] requiring medical professionals to purchase primary liability occurrence policies *or claims-made policies with a reporting tail.* The Court equated the two policy formulations as essentially consistent. *See id.* at 494–95 (noting that, to preserve the framework of the

CAT Fund and a provider's eligibility to use it, "primary coverage must be available either through an occurrence policy, a still-valid claims policy, or a tail or similar policy"). In this regard, we agree with the commissioner that denying UHS's claims on the basis proffered by PPCIGA "would create an anomalous situation in which a health care provider who purchased a reporting tail endorsement for the express purpose of complying with statutory minimum insurance requirements [for example, under the CAT Fund] might then have no coverage at all." (Notice of Claim Determination, at 4.)

¶ 17 We conclude that there is no basis for PPCIGA to distinguish, as a categorical matter, between claims filed under an occurrence policy and claims filed during the reporting tail period of a claims-made policy. Furthermore, while we recognize PPCIGA's arguments with respect to the specific policy language at issue, we conclude that UHS's claims, reported within the reporting tail period of the PHICO policy, "existed" or "arose" within the 30-day insolvency period in Section 991.1803(b)(1)(i) of the Guaranty Act.

¶ 18 In this regard, we find support from the decisions in *Benson v. New Hampshire Ins. Guar. Ass'n,* 151 N.H. 590, 864 A.2d 359 (2004) and *Kentucky Ins. Guar. Ass'n v. Natural Res. and Envtl. Prot. Cabinet,* 781 S.W.2d 519 (Ky.1989), which interpret the New Hampshire and Kentucky versions of our Guaranty Act.[13]

12. The CAT Fund was created by the Health Care Services Malpractice Act, 40 P.S. §§ 1301.701–1301.1006, as a contingency fund providing excess liability insurance to health care professionals who maintained minimum levels of primary liability insurance. *See generally Paternaster,* 863 A.2d at 491–92.

13. Because the Guaranty Act was derived from a model, uniform law promulgated by

the National Association of Insurance Commissioners and adopted by most states, *see generally Bell v. Slezak,* 571 Pa. 333, 342, 812 A.2d 566, 571 (2002), the judicial construction given to such legislation by the courts of our sister states may be considered when interpreting the Act. *See Burke v. Valley Lines, Inc.,* 421 Pa.Super. 362, 367 n. 1, 617 A.2d 1335, 1337 n. 1 (1992) (interpreting PIGA); *In re Gumpher,* 840 A.2d 318, 321 (Pa.Su-

In *Benson, supra,* the New Hampshire Supreme Court addressed a situation similar to the instant case, wherein it interpreted New Hampshire's guaranty act, and, in particular, its equivalent to 40 P.S. § 991.1803(b)(1)(i), which is substantially identical in relevant part. *See* N.H.R.S.A. § 404–B:8.[14] The appellants therein were doctors who, upon their retirement, purchased reporting tail coverage for their claims-made professional liability policies. When their liability carrier, also PHICO, became insolvent and they were informed that the New Hampshire Insurance Guaranty Association ("NHIGA") would not cover claims under reporting tail policies, they brought a class action declaratory judgment action against NHIGA seeking a declaration that NHIGA was required to provide such coverage. NHIGA responded with arguments similar to those advanced by PPCIGA herein—namely, that it was not obligated to cover claims made after the 30–day period because a claim "arises" under that section only if it is filed with, or brought to the attention of, NHI-

GA within the 30–day period. *Benson,* 864 A.2d at 365. The appellants argued, conversely, that NHIGA was essentially a substitute insurer, and was liable for any negligent acts that occurred within the 30–day period. *Id.*

¶ 19 The court, however, found a middle course, concluding that a claim "arises" under the guaranty act when the underlying tort arises—that is, when harm results from a negligent act. *Benson,* 864 A.2d at 365.[15] Thus, it concluded that if the claimant was harmed within the 30–day period, the claim was an obligation of NHIGA. Although it narrowed NHIGA's obligations, aligning the meaning of "arise" in the statute with the meaning of "arise" in the context of a tort action, the court nonetheless concluded that a claim reported under the reporting tail of a claims-made policy, but after the 30–day statutory period, may arise under the guaranty act, triggering the obligation of the guaranty association to cover the claim.

per.2003) (interpreting the Pennsylvania Uniform Transfer to Minors Act, 20 Pa.C.S.A. § 5301 *et seq.*); 1 Pa.C.S.A. § 1927 ("Statutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them.").

14. This section provides, in part, that the New Hampshire Insurance Guaranty Association:

Be obligated to the extent of the covered claims existing prior to the determination of insolvency and arising within 30 days after the determination of insolvency, or before the policy expiration date if less than 30 days after the determination, or before the insured replaces the policy or causes its cancellation, if he does so within 30 days of the determination . . . .
N.H.R.S.A. § 404–B:8(a).

15. The court explained:

Any malpractice claims against the plaintiffs, who retired prior to PHICO's insolvency declaration, would necessarily be the

result of events that took place prior to or within thirty days of PHICO's insolvency. However, for a claim to arise, a person must have suffered harm caused by the alleged malpractice, since a cause of action arises only when all the necessary elements are present. A cause of action for tort arises when causal negligence is coupled with *harm* to the plaintiff. *Conrad v. Hazen,* 140 N.H. 249, 252, 665 A.2d 372 (1995). A potential medical malpractice claimant has a cause of action the moment harm is suffered. If the claimant suffered harm prior to the expiration of the thirty-day period during which claims can arise under the statute, then NHIGA will be obligated on that claim no matter when it is filed, within the underlying statute of limitations, because RSA chapter 404–B does not contain a filing deadline. If the harm was not suffered before the expiration of the thirty-day period, however, the claim did not arise within the period, and NHIGA is not obligated on that claim.
*Benson,* 864 A.2d at 365 (emphasis original).

¶ 20 The decision of the Kentucky Supreme Court in *Kentucky Ins. Guar. Assoc., supra,* although it concerned performance bonds, not malpractice claims, comes to an analogous conclusion. Therein, the court addressed whether the Kentucky Insurance Guarantee Association ("KIGA") was required to cover claims against insolvent insurers which had executed surety bonds to guarantee performance of the conditions of certain mining permits.[16] The central question was whether, under Kentucky's equivalent to 40 P.S. § 991.1803(b)(1)(i), *see* Ky.R.S.A. § 304.36–080(1)(a),[17] a claim against the surety "existed" when the permit holder violated the conditions of the permit, or only when the performance bond was declared to be forfeited. *Kentucky Ins. Guar. Assoc.,* 781 S.W.2d at 521. As it was undisputed that a claim could only be enforced against the surety when the bond was forfeited, *id.* at 520, KIGA asserted that it was obligated only where the performance bonds were forfeited within 30 days of the surety's insolvency, *id.* at 521. By contrast, the insured asserted that a claim existed when the permit was violated, whether or not the bond was yet forfeited. *Id.*

¶ 21 The court, citing the purpose of Kentucky's guaranty act to provide "a mechanism for the payment of claims to avoid financial loss because of the insolvency of an insurer", interpreted the claim "against the bonding companies [to be] coexistent with [the] claim against the per-

mittees under the mining permit." *Id.* It held that KIGA was obligated "for a loss for which the insolvent insurer would have been liable at the time of the declaration of the insolvency or within 30 days thereafter." *Id.* In other words, a claim against the guaranty association "existed" under the guaranty act even though the event triggering the surety's obligation, the forfeiture of the bond, occurred after the 30–day insolvency period. The court reasoned that this result was justified, in part, because "[w]hen an insurer becomes insolvent, it is possible for a policyholder to acquire other insurance that will protect him from future losses but he cannot secure insurance against losses which have already occurred." *Id.* at 521

¶ 22 In both *Benson* and *Kentucky Ins. Guar. Assoc.,* the courts found that a claim existed or arose for purposes of the respective guaranty acts if the act triggering the claim—in *Benson,* the malpractice, and in *Kentucky Ins. Guar. Assoc.,* the violation of the permit—occurred prior to the insurer's insolvency, or within 30 days thereafter. We find the rationale in these cases to be persuasive, and to be consistent with the Guaranty Act's purpose of avoiding "financial loss to claimants or policyholders as a result of the insolvency of an insurer." 40 P.S. § 991.1801(1). We hold that a covered claim against PPCIGA exists before insolvency, or arises within 30 days after the insolvency, if the act triggering the claim occurred within those

16. According to the court:
The only purpose of a performance bond in these cases is to guarantee the performance by the principal of the undertaking set forth in the conditions of the bond. In these cases the bonding companies guaranteed that the principal would faithfully perform all the requirements of the application for the permit and the applicable laws and regulations relating thereto.

*Kentucky Ins. Guar. Assoc.,* 781 S.W.2d at 521.

17. In relevant part, KIGA was obligated "to the extent of the covered claims existing prior to the order of liquidation and arising within thirty (30) days after the order of liquidation". Ky.R.S.A. § 304.36–080(1)(a).

same timeframes.[18] Consistent with PPCIGA's treatment of occurrence policies, therefore, we conclude that PPCIGA is obligated on covered claims filed during the reporting tail period of a claims-made policy, when the act triggering the claims occurred before insolvency, or within 30 days thereafter.

¶ 23 PPCIGA additionally asserts, however, that UHS's claims were not "covered claims" under the Guaranty Act, arguing that the reporting tail coverage was cancelled pursuant to Section 221.21 of the Liquidation Act.[19] As we stated above, Section 221.21 allows policies of liquidated insurers to remain in effect, at the latest, for "thirty days from the date of entry of the liquidation order." *See* 40 P.S. § 221.21. PPCIGA argues that since the PHICO policy was terminated by operation of Section 221.21, UHS's claim was not a "covered claim" under Section 991.1802 of the Guaranty Act because the claim could not arise out of or be within the coverage of a terminated policy. We find PPCIGA's four-sentence argument in this regard (*see* Appellant's Brief at 15), to be unpersuasive.

¶ 24 First, we note that PPCIGA's claims are inconsistent with its approach to covering claims under occurrence policies. PPCIGA has essentially conceded that if UHS's policy were an occurrence policy, PPCIGA would have been obligated to provide coverage. Yet, the arguments it makes with respect to Section 221.21 of the Liquidation Act are equally applicable to occurrence policies.

¶ 25 Second, we agree with the insurance commissioner that the Liquidation Act and the Guaranty Act should be read together, *in pari materia*—that is, as one statute—as they address a common issue, namely, losses to the insureds of insolvent insurance companies. (*See* Notice of Claim Determination, at 4); *see also* 1 Pa.C.S.A. § 1932[20]; *cf. Matusz v. Safeguard Mut. Ins. Co.*, 340 Pa.Super. 116, 120, 489 A.2d 868, 870 (1985) (interpreting as *in pari materia* the predecessor to the Guaranty Act and Pennsylvania's now-repealed no-fault motor vehicle insurance act because both statutes address the victims of accidental injuries). The commissioner concluded that "both statutes should be construed in a consistent manner to provide coverage where, as here, UHS has purchased a reporting tail endorsement to cover prior acts or events of alleged malpractice, and then suffers losses due to the insurer's insolvency." (Notice of Claim Determination, at 4.) We agree, and reject PPCIGA's assertion that operation of the Liquidation Act negated claims otherwise valid under the Guaranty Act.

¶ 26 It is undisputed that the acts giving rise to UHS's claims herein occurred prior to or within 30 days of PHICO's insolvency; thus, we find that PPCIGA is obligated to cover those claims reported during the reporting tail endorsement to UHS's claims-made policy. Accordingly, we af-

---

**18.** We do not align ourselves, however, with the additional limitation in *Benson, supra,* which tied the existence of a claim to the time the underlying tort action arose—namely, when the claimant was harmed. We find such a restriction would conflict with PPCIGA's practice, and the caselaw approving that practice, *see supra* note 10 and accompanying text, regarding the treatment of claims under occurrence policies.

**19.** *See supra* note 7.

**20.** Section 1932 provides:

**Statutes in pari materia**
 (a) Statutes or parts of statutes are in pari materia when they relate to the same persons or things or to the same class of persons or things.
 (b) Statutes in pari materia shall be construed together, if possible, as one statute.
1 Pa.C.S.A. § 1932.

firm the order entering summary judgment in favor of UHS.

¶ 27 Order **AFFIRMED.**