Norman L. KRAPF, Individually and as Executor of the Estate of Irene E. Krapf, Deceased, Appellee

v.

ST. LUKE'S HOSPITAL and St. Luke's Hospital and Health Network and Charles Cullen, Appellants.

Alverta M. Spangler, Individually and as Executrix of the Estate of Samuel S. Spangler, Deceased, Appellee

v.

St. Luke's Hospital and St. Luke's Hospital and Health Network and Charles Cullen, Appellants.

Monica L. Galgon, Individually and as Executrix of the Estate of Paul F. Galgon, Deceased, Appellee

v.

St. Luke's Hospital and St. Luke's Hospital and Health Network and Charles Cullen, Appellants.

You Young Park, Individually and as Administratrix of the Estate of William M. Park, Deceased, Appellee

v.

St. Luke's Hospital and St. Luke's Hospital and Health Network and Charles Cullen, Appellants.

Ruthanne M. Svetecz, as Executrix of the Estate of Audrey George, Deceased, Executrix of Daniel W. George, Deceased, Appellee

v.

St. Luke's Hospital and St. Luke's Hospital and Health Network and Charles Cullen, Appellants.

Superior Court of Pennsylvania.

Argued May 5, 2010.
Filed July 27, 2010.
Reargument Denied Sept. 24, 2010.

Arthur W. Hankin, Philadelphia, for appellants.

Mark K. Altemose, Bethlehem, for appellees.

BEFORE: GANTMAN, SHOGAN, and MUNDY, JJ.

OPINION BY MUNDY, J.:

¶ 1 Appellant,[1] St. Luke's Hospital and St. Luke's Hospital and Health Network (hereinafter referred to collectively as St. Luke's), appeals from the order entered on June 30, 2009 denying its motion for summary judgment. Appellees represent the estates of five separate decedents in wrongful death and survival actions filed against St. Luke's pursuant to 42 Pa. C.S.A. §§ 8301 and 8302. Those Appellees include Norman L. Krapf, executor of the estate of Irene E. Krapf, Alverta M. Spangler, executrix of the estate of Samuel S. Spangler, Monica L. Galgon, executrix of the estate of Paul F. Galgon, You Young Park,[2] administratrix of the estate of William M. Park, and Ruthanne M. Svetecz, executrix of the estate of Audrey George, who was the executrix of the estate of Daniel W. George. Appellees' decedents were patients at St. Luke's while Charles Cullen was employed as a nurse by the hospital in its coronary care unit. After careful review, we affirm the trial court's denial of summary judgment in favor of St. Luke's.

¶ 2 The trial court aptly set forth the relevant facts and procedural history of this case as follows.

[Charles] Cullen began working as a nurse in the Coronary Care Unit (CCU) of St. Luke's on June 5, 2000. On June 2, 2002, Hospital staff found various used and unused medications improperly disposed in a receptacle for used syringes, or a "sharps" bin, in the CCU. (Pl.

Ex. TT at 50–57; Ex. SS at 32; Ex. U at 2; Ex. XX at 94.) Through its nurse manager, the Hospital commenced an investigation by, at first, monitoring the receptacle to see if the culprit would place any more unauthorized medicines in the bin. (Pl.Ex. XX at 98.) The next day, June 3, 2002, Nurse Gerald Kimble found the box full of used and unused containers of medications, including Vecuronium and nitroprusside. (Pl. Ex. SS at 37; Ex. U at 2.)

Because the authorized use of these medications could not be substantiated, and with the Hospital's in-house counsel on administrative leave at the time, Risk Manager Jan Rader requested that outside counsel, Attorney Paul Laughlin, come to the Hospital and conduct an investigation on its behalf. (Pl.Ex. UUU at 63–86.) Attorney Laughlin interviewed several employees, including Nurse Kimble who informed him that Cullen had exhibited strange or quirky behavior. (Pl.Ex. WWW at 1–3.) Attorney Laughlin did not interview Cullen at that time and left the hospital without identifying the culprit. (*Ibid.*)

On June 4, 2002, at approximately 11:00 p.m., more used and unused medications were found in the sharps disposal bin in the CCU medication room. (*Id.* at 4–5.) Risk Manager Rader reached Attorney Laughlin by telephone at approximately 2:00 a.m. on June 5, 2002, and expressed her concern that Cullen was to blame for the diversion of medications and that she wanted him removed from his job duties because he may have also been using those drugs to

---

1. Charles Cullen is not a party to this appeal as he failed to file a responsive pleading to the complaints consolidated in this appeal and default judgment has been entered against him. Currently, Charles Cullen is incarcerated.

2. Throughout the certified record, this name appears spelled differently; as Yoo Young Park, and You Young Park. Because the name provided to this Court is You, we shall refer to the party accordingly.

harm patients. (Pl.Ex. UUU at 98–104.) Confronted by Attorney Laughlin, Cullen denied diverting medications but offered to resign; he was escorted from the Hospital by security. (*See* Pl.Ex. WWW at 5.) Later that day, on June 5, 2002, the Hospital decided to accept his resignation and Cullen never returned to duty at St. Luke's. (*See* Pl.Ex. XX at 124.)

Attorney Laughlin recalls that he suggested patient charts be reviewed to ascertain whether the diverted Vecuronium had been improperly administered, thereby resulting in patient harm (Pl. Ex. VVV at 40–44); however, the question of what precisely Attorney Laughlin learned during, and concluded from, his investigation is not clear. And in that respect, the deposition testimony of the various witnesses diverges considerably. Attorney Laughlin has indicated that particularized suspicion of Cullen harming patients was never brought to his attention. (*See Id.* at 127–35.) However, notes from his interviews in combination with testimony of Nurse Patricia Medellin leave it within the purview of the finder of fact to draw a different inference.

Specifically, Nurse Medellin has stated she met with Attorney Laughlin on the night he confronted Cullen and that he had instructed her call him if she "had any additional thoughts." (Pl.Ex. III at 72.) After learning that opened containers of Vecuronium had been found in the receptacles and that other nurses had concerns that patients may have been harmed, she telephoned Attorney Laughlin on or about June 7, 2002. (Pl.Ex. at 76–78.) She informed him that the unauthorized administration of Vecuronium would be consistent with unexplained slowing down of patient heart-rates, leading to "codes" when their hearts stopped. (*Id.* at 79.)

She also told Attorney Laughlin that no one in the CCU at that time should have been receiving Vecuronium. (*Ibid.*)

In response to this, however, Attorney Laughlin informed Nurse Medellin that "the investigation was closed" and that he was "confident that Cullen was not in any way harming patients." (*Id.* at 80.) Nurse Medellin pressed Attorney Laughlin about how he could be so sure, especially when Attorney Laughlin had admitted to her that he had not compared the medications sent from the pharmacy versus those actually used on patients and had not compared the number of patient codes on day-versus night-[ ]shifts when Cullen was on duty. (*Id.* at 81–82.) Attorney Laughlin allegedly responded that based on his experience as a prosecutor in Philadelphia for eight years, he was confident in his investigation and was "certain" that Cullen "was not hurting anyone." (*Ibid.*) He then informed her once again that the investigation was "closed and not open … for further review." (*Id.* at 82.)

Nurse Medellin has also testified at deposition that she voiced her concerns to her supervisors, but that she was met with an equally inhospitable response. (*Id.* at 96.) In particular, she states that after Attorney Laughlin dismissed her concerns, she spoke to the Clinical Coordinator at St. Luke's, Thelma Moyer, and the CCU Nurse Manager at the Hospital, Ellen Amedeo, both of whom dismissed her concerns and informed her that the investigation was closed. (*Ibid.*) She also testified that after speaking with Attorney Laughlin, she compiled a list of the patients who died in the CCU and compared it to Cullen's shifts and determined that a disproportionate number of patients died while he was on duty. (*Id.* at 91–93.) However, because of the lack of receptivity and

"almost anger" expressed by Clinical Coordinator Moyer and CCU Nurse Manager Amedeo to her previous entreaties, Nurse Medellin did not present the list she compiled for fear of "repercussions." (*Id.* at 97.) Instead, she brought the matter to the attention of a police-officer friend of hers, who, in turn, arranged an appointment with the Lehigh County District Attorney. (*Id.* at 101–105.)

Other nurses, including Judy Glessner and Darla Beers, have also testified that concern was present among the nursing staff that Cullen had harmed patients, but neither of those witnesses recalled expressing any particularized concerns to Laughlin. (*See* Pl.Ex. RR at 72–77; Ex. PPP at 72–73; *see also* Ex. U at 2 (police report summarizing statement given by Nurse Kimble about his belief Cullen had harmed patients with diverted medications)). However, Assistant Pharmacy Director Susan Reed has testified that she recalled expressing to Laughlin that the nature of the empty medications found, including Vecuronium, raised a concern about potential patient harm. (*See* Pl.Ex. VV at 128–30.) And notes Attorney Laughlin apparently took during his conversation with Nurse Medellin contain abbreviated descriptions that could be understood as references to patients being harmed by Cullen and "cod[ing] fast." (*See* Pl.Ex. CCCC.) Testimony from the Hospital's Vice President of Risk Management, Gary Guidetti, indicates, however, that Attorney Laughlin never apprised him of concerns about patient harm or otherwise passed those concerns onto upper management. (*See* Pl.Ex. FFFF at 36–39.)

After he returned from leave in July 2002, the Hospital's General Counsel, Seymour Traub, directed Attorney Laughlin to prepare a report and or-

dered additional chart reviews to be performed by St. Luke's staff. (*See* Pl.Ex. BBBB at 30.) General Counsel Traub testified that Attorney Laughlin never mentioned that any nurses had conveyed concerns about Cullen harming patients. (*Ibid.*) Risk Manager Rader and Nursing Supervisor Koller were charged with reviewing charts of all of the patients who had died over the course of the weekend in which the diverted medications were found. (*See* Pl.Ex. UUU at 21.) However, Nursing Supervisor Koller testified at deposition that she had never before performed any similar such chart review and, in fact, was not even aware of the purpose of her review when Risk Manager Rader asked her to review the patient charts. (Pl.Ex. AAAA at 46–50.) For her part, Risk Manager Rader testified at deposition that Attorney Laughlin indicated to her at that point that he could not find "a scintilla of evidence that there was any foul play involved[.]" (Pl.Ex. UUU at 114.) In any event, as a result of this review, Risk Manager Rader and Nursing Supervisor Koller identified neither any suspicious administration of Vecuronium nor any suspicious deaths. (Pl.Ex. UUU at 138.) Accordingly, the additional inquiries ordered by General Counsel Traub failed to unearth Cullen's involvement in patient deaths and, thereafter, the Hospital's Chief Executive Officer concluded this part of the investigation by referring Cullen to the State Board of Nursing for follow up as it saw fit. (Pl.Ex. III.)

Outside the Hospital, and as a result of the meeting with Nurse Medellin, the District Attorney of Lehigh County commenced an investigation, but it bore little fruit. Working with the Pennsylvania State Police, the District Attorney retained a forensic pathologist, Dr. Isa-

dore Mihalikis, who reviewed seventeen patient charts selected by St. Luke's. (Pl.Ex. MMMM at 18–35.) However, Dr. Mihalikis was not provided with a written list of the diverted medications and apparently had no contact with any of the nurses or their statements regarding suspicions about Cullen. (*Ibid.*) Dr. Mihalikis was unable to conclude that Cullen had harmed anyone. (*Id.* at 50–55.)

Notwithstanding the concerns expressed to them, as described by Nurse Medellin, neither Clinical Coordinator Moyer nor CCU Nurse Manager Amedeo informed the State Police of nurses' concerns that Cullen may have harmed patients. (*See* Pl.Ex. U at 12–14.) After notification by the District Attorney that the matter had been referred to law enforcement, the Hospital undertook further investigations, including patient-chart review by an outside physician; however, this, too, failed to lead St. Luke's to conclude Cullen had harmed any patients. (*See* Pl.Ex. NNN at 51–55, 125–27.)

As already noted, the breakthrough came in October 2003, when Cullen's subsequent employer, the Somerset Medical Center, attributed abnormal patient chemistries to Cullen's actions and fired him. (Pl.Ex. C.) Subsequently, in response to questioning by the New Jersey State Police in December of that year, Cullen confessed to having killed patients both in New Jersey and in Pennsylvania. (*Ibid.*) The Lehigh County District Attorney and the Hospital then reopened their investigations and Cullen ultimately confessed to killing, among others, the five decedents at issue in these cases. (*See* Pl.Ex. B; Ex. C.) The estates of those decedents, however, had all been previously issued death certificates indicating causes of death consistent with the progression of the respective diseases for which the patients had been receiving treatment at St. Luke's. (*See* Pl.Ex. Z, Ex. A, Ex. HH, Ex. KK, Ex. PPPP.) The Plaintiffs evidently first learned of their potential causes of action only after media reports in the wake of Cullen's confessions, which indicated that some of his deadly actions occurred during his tenure at St. Luke's.

Trial Court Opinion, 7/9/09, at 5–11 (citations in original; footnote omitted).

¶ 3 Appellees sought recovery of damages, pursuant to the Pennsylvania Wrongful Death and Survival Statutes, for the alleged negligent treatment and wrongful death of the decedents. St. Luke's responded by raising in new matter, pursuant to Pa.R.C.P. 1030, the defense of the applicable two-year statute of limitations.[3] After the pleadings were closed and discovery complete,[4] St. Luke's moved for summary judgment on the grounds that the actions were barred by the statute of limitations. Appellees argued that the doctrine of fraudulent concealment served to toll the running of the statute of limitations in these actions. The trial judge, the Honorable Edward D. Reibman, after thorough analysis and thoughtful consideration, denied St. Luke's motion for summary judgment "because a genuine issue of material fact remains on the applicability of the fraudulent concealment doctrine." Trial Court Opinion, 7/9/09, at 3. In an Order dated August 5, 2009, the trial court denied St. Luke's motion for reconsideration and certification for interlocutory appeal. Certified Record at 31. A petition

---

3. 42 Pa.C.S.A. § 5524.

4. The individual cases were consolidated by the trial court for discovery.

for review filed by St. Luke's pursuant to Pa.R.A.P. 1501 *et seq.* was subsequently granted and this appeal followed.[5]

¶ 4 St. Luke's raises the following issues on appeal.[6]

1. Did the trial court improperly find that the fraudulent concealment doctrine could toll the statute of limitations where the evidence, read in a light most favorable to Plaintiffs, demonstrated that St. Luke's did not know that Cullen murdered the Plaintiffs' decedents, until after the two-year statutory period had run?

2. Did the trial court improperly apply the doctrine of willful blindness to St. Luke's where (a) in order for fraudulent concealment to toll the statutory period, plaintiffs must show that defendants had actual knowledge, and (b) St. Luke's initiated or cooperated in five investigations?

3. Did the trial court improperly state St. Luke's duty to Plaintiffs when it held that St. Luke's could be liable to Plaintiffs under the doctrine of fraudulent concealment if it became aware that it was highly probable that a hospital employee was killing hospital patients, given that the clear and convincing standard of proof applies to fraudulent concealment?

4. Was the trial court mistaken when it found that St. Luke's was responsible for affirmatively misrepresenting Plaintiffs' decedents' causes of death where Plaintiffs did not offer any evidence to indicate that St. Luke's was responsible for the death certificates and St. Luke's did not know, until after the statutory

period had run, that decedents had actually been murdered?

St. Luke's Brief at 2–3.

¶ 5 "Our scope of review of a trial court's order granting or denying summary judgment is plenary, and our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or abused its discretion." *Universal Health Services, Inc. v. Pennsylvania Property and Casualty Insurance Guaranty Assoc.*, 884 A.2d 889, 892 (Pa.Super.2005) (citation omitted).

> The entry of summary judgment is proper whenever no genuine issue of any material fact exists as to a necessary element of the cause of action. The moving party's right to summary judgment must be clear and free from doubt. We examine the record, which consists of all pleadings, as well as any depositions, answers to interrogatories, admissions, affidavits, and expert reports, in a light most favorable to the non-moving party, and we resolve all doubts as to the existence of a genuine issue of material fact against the moving party.

*LJL Transp., Inc. v. Pilot Air Freight Corp.*, 599 Pa. 546, 962 A.2d 639, 647 (2009) (citations omitted).

¶ 6 For the purposes of our review, we have elected to address the interrelated issues raised by St. Luke's simultaneously. Pursuant to 42 Pa.C.S.A. § 5524, the statute of limitations for a wrongful death and survival action is two years, and in each of the cases before us, the statute of limitations had run prior to the institution of suit. "There are exceptions that act to toll the running of the statute of limitations. The discovery rule

---

5. The trial court did not order St. Luke's to comply with Pa.R.A.P. 1925.

6. The appeal in this matter has been consolidated, argued, and briefed as if a single appeal.

and the doctrine of fraudulent concealment are such exceptions." *Fine v. Checcio,* 582 Pa. 253, 870 A.2d 850, 858 (2005). Because the discovery rule is inapplicable to wrongful death and survival actions,[7] the entry of summary judgment in this matter is dependent on the applicability of the doctrine of fraudulent concealment. Similar to the discovery rule, the doctrine of fraudulent concealment tolls the running of the statute of limitations.

> The doctrine is based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts. The doctrine does not require fraud in the strictest sense encompassing an intent to deceive, but rather, fraud in the broadest sense, which includes an unintentional deception. The plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence. While it is for the court to determine whether an estoppel results from established facts, it is for the jury to say whether the remarks that are alleged to constitute the fraud or concealment were made.

*Fine, supra* at 860; *see also Nesbitt v. Erie Coach Co.,* 416 Pa. 89, 204 A.2d 473 (1964).

¶ 7 It is clear that a "defendant's conduct need not rise to fraud or concealment in the strictest sense, that is, with an intent to deceive; unintentional fraud or concealment is sufficient." *Molineux v. Reed,* 516 Pa. 398, 532 A.2d 792, 794 (1987). Reiterating the fact that the doctrine captures even unintentional conduct on the defendant's part, our Supreme Court in *Fine, supra,* concluded that a "statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." *Fine, supra* at 861.

¶ 8 For the doctrine of fraudulent concealment to be applicable, "[a] defendant must have committed some affirmative independent act of concealment upon which [a] plaintiff[ ] justifiably relied." *Lange v. Burd,* 800 A.2d 336, 339 (Pa.Super.2002). There must exist a duty to speak before fraudulent concealment can be found. *Id.* Mere silence in the absence of a duty to speak cannot suffice to prove fraudulent concealment. *Id.*

¶ 9 Under these standards, we conclude the trial court properly found the doctrine of fraudulent concealment applicable to the affirmative act of St. Luke's in issuing death certificates[8] for each of the decedents upon which Appellees relied to their detriment, that the deaths were from the natural progression of various underlying conditions or disease processes. To wit,

---

7. In *Pastierik v. Duquesne Light Co.,* 514 Pa. 517, 526 A.2d 323, 325–326 (1987), our Supreme Court reaffirmed that the discovery rule never tolls the statute of limitations in wrongful death and survival actions. The factual circumstances of the case *sub judice* lend credence to the proposition that **one should never say never.**

8. A death certificate was issued to Appellees for Irene Krapf stating the cause of death was "asystole, end stage cardiomyopathy, coronary artery disease." A death certificate was issued to Appellees for William Park stating the cause of death was "coronary artery disease." A death certificate was issued to Appellees for Paul Galgon stating the cause of death was "renal failure, sepsis." A death certificate was issued to Appellees for Samuel Spangler stating the cause of death was "cardiorespiratory failure, coronary artery disease." And a death certificate was issued to Appellees for Daniel George with no cause of death noted. Appellees' Brief at 3–4.

[q]uite simply, in every case in which St. Luke's made an affirmative but incorrect representation about the cause of death of the decedent, responsibility for such deception—albeit unintentional—must repose with the Hospital until such time as Plaintiff through reasonable and ordinary diligence would have ascertained that another cause of death was reasonably at issue. Accordingly, in the absence of proof that it did not bear any responsibility for the representations contained in the death certificates, [St. Luke's] cannot prevail on a motion for summary judgment based on its defense under the statute of limitations.

Trial Court Opinion, 7/9/09, at 18. Because even unintentional concealment is sufficient to invoke the fraudulent concealment doctrine, *Fine, supra.,* St. Luke's argument denying actual knowledge of the murders until after the statute of limitations had run is of no consequence to this analysis. Indeed, the death certificates in this case are clear and convincing evidence of fraudulent concealment in the nature of an unintentional deception.

■■■ ¶ 10 Now, we must determine whether a duty existed requiring St. Luke's to disclose to the patients or their families the fact that a nurse in the course and scope of his employment was harming patients at St. Luke's. Such a duty may arise either by statute or by application of common law doctrine. In this vein, we shall first examine statutory law to determine if a duty to disclose exists by operation of law. Section 51.3 of Title 28, Health and Safety, sets forth regulations which obligate a hospital to provide an immediate report to the Department of Health as follows.

(f) If a health care facility is aware of a situation or the occurrence of an event at the facility which could seriously compromise quality assurance or patient safety, the facility shall immediately notify the Department in writing. The notification shall include sufficient detail and information to alert the Department as to the reason for its occurrence and the steps which the health care facility shall take to rectify the situation.

(g) For purposes of subsections (e) and (f), events which seriously compromise quality assurance or patient safety include, but are not limited to, the following:

(1) Deaths due to injuries, suicide or unusual circumstances.

28 Pa.Code § 51.3. Moreover, pursuant to § 103.22 of the Code, "the hospital shall establish a Patient's Bill of Rights" which specifically includes the following provisions.

(7) The patient has the right to good quality care and high professional standards that are continually maintained and reviewed.

(8) The patient has the right to **full information** in layman's terms, concerning his diagnosis, treatment, and prognosis, including information about alternative treatments and **possible complications.** When it is not medically advisable to give such information to the patient, the information shall be given on his behalf to the patient's next of kin or other appropriate person.

28 Pa.Code § 103.22 (emphasis added). Our reading of these portions of the Code establishes a duty upon St. Luke's to provide the patient or the patient's next of kin full information regarding their medical treatment. Under § 51.3, a health care facility must immediately report deaths due to unusual circumstances to the Department of Health. Given the patient or the patient's next of kin's right to full information concerning medical treatment, it is consistent that the patient or patient's next of kin would also be advised when an

employee of the treating hospital is harming patients under its care. Our interpretation of these duties is consistent with the goal of improving the health and safety of patients within our health care systems. Specifically, in 2002, the legislature recognized the need to codify a duty to disclose to the patient or the patient's next of kin under enumerated circumstances.[9]

¶ 11 Next, we shall discuss whether St. Luke's had a duty to disclose from a common law perspective. In the seminal case of *Thompson v. Nason Hospital*, 527 Pa. 330, 591 A.2d 703 (1991), our Supreme Court determined that the theory of corporate liability should apply to hospitals.

> Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital. This theory of liability creates a nondelegable duty which the hospital owes directly to the patient. Therefore, an injured party does not have to rely on and establish the negligence of a third party.

> The hospital's duties have been classified into four general areas: (1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt

and enforce adequate rules and policies to ensure quality care for the patients. *Id.* at 707. (internal citations omitted). In applying these standards, the Supreme Court held

> [i]t is well established that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients. If the attending physician fails to act after being informed of such abnormalities, it is then incumbent upon the hospital staff member or employee to so advise the hospital authorities so that appropriate action might be taken.

*Id.* at 709 (internal citations omitted). The Supreme Court adopted these new standards of corporate liability "[i]n recognition of the corporate hospital's role in the total health care of its patients." *Id.* at 708. In applying corporate liability, we have recognized the theory of constructive notice as follows.

> While appellant continues to argue that it had no actual notice, it offers no reason why constructive notice cannot or should not be imposed. Appellant may properly be charged with constructive notice since it should have known of the decedent's condition. *See Edwards*, 652 A.2d at 1387 (to make out a viable *Thompson* claim, a plaintiff must prove that hospital knew or should have known of the mistake or deficiency). In *Welsh*, our supreme court found that a *prima facie* case of corporate negligence had been established when plaintiff's expert

---

9. The Medical Care Availability and Reduction of Error (MCARE) Act, 40 P.S. § 1303.101 *et seq.*, which was enacted March 20, 2002, reformed the law on medical professional liability including providing for patient safety and reporting. MCARE requires a health care worker who reasonably believes that a serious event or incident has occurred to report the same in accordance with the patient safety plan of the medical facility immediately or as soon as reasonably practicable, but in no event later than 24 hours after the occurrence or discovery. Further, a medical facility, through an appropriate designee, shall provide written notification to a patient affected by a serious event within seven days of the occurrence or discovery. 40 P.S. § 1303.308. However, MCARE had not yet become effective when these events occurred.

opined that the hospital's nurses must have known there was a problem but failed to act on that knowledge. *Welsh,* 698 A.2d at 584. As in *Welsh,* appellant here is also liable since it must have known what was going on but failed to act.

*Whittington v. Episcopal Hospital,* 768 A.2d 1144, 1154 (Pa.Super.2001).

> It is well settled that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients. [ ... ] A hospital is properly charged with constructive notice when it "should have known" of the patient's condition. Furthermore, constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision. We interpret "failure to enforce adequate rules and policies" as an analog to "failure to provide adequate supervision."

*Brodowski v. Ryave,* 885 A.2d 1045, 1057 (Pa.Super.2005) (*en banc*), *appeal denied,* 587 Pa. 680, 897 A.2d 449 (2006).

¶ 12 The facts of record provide a basis for the application of constructive notice on the part of St. Luke's.

> [T]he testimony of Nurse Medellin who claims that she raised particularized concerns about Cullen harming patients, but that she was repeatedly shunned by her superiors and those in charge of investigating the diversion of dangerous medications, namely, Clinical Coordinator Moyer, CCU Nurse Manager Amedeo and Attorney Laughlin. In addition, there is evidence indicating that opened containers of Vecuronium were recovered in the trash but no patient in the CCU was at that time authorized to receive that dangerous drug. Moreover, Nurse Medellin testified that she informed Attorney Laughlin that the unexplained slowing of heart rates could have been explained by the administration of Vecuronium, but he summarily informed her that the investigation was closed, notwithstanding the fact that, according to Nurse Medellin, he admitted that he had not cross-checked the list of medications sent from the pharmacy against those authorized for patient use nor had he compared the rate of patient codes to times when Cullen was on duty.

Trial Court Opinion, 7/9/09, at 29.[10]

¶ 13 In upholding the trial court's finding, we conclude that hospitals have an affirmative duty to inform a patient or their next of kin when it knows or should have known "that one of its employees either killed, or, by administering unauthorized medications, attempted to kill a patient." Trial Court Opinion, 7/9/09, at 25.

To the extent the duty identified here on part of the hospital represents new legal ground in this Commonwealth, that terrain is, in this instance, trod without trepidation or reservation. In that respect, our Supreme Court, on more than one occasion, has placed the role of a common-law court in proper perspective:

> In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, "always keeping in mind the fact that we en-

---

10. Because we find the theory of constructive notice applicable to the facts before us, we conclude St. Luke's argument that it had no actual knowledge is without merit. Further, given our conclusion, we find it unnecessary to discuss the trial court's application of the willful blindness doctrine as argued by St. Luke's in issue number two.

deavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."

*R.W. v. Manzek,* 585 Pa. 335, 888 A.2d 740, 747 (2005) (quoting William L. Prosser, *Palsgraf Revisited,* 52 Mich. L.Rev. 1, 14–15 (1953)).

In light of those factors set forth in *Manzek, supra,* it would be shocking to contemplate a state of affairs where society would condone a hospital keeping silent while knowing, or being aware that it is highly probable, that a member of its staff killed a patient. Accordingly, the duty to disclose such information surely flows not merely as a concomitant of the express duties set forth in *Thompson, supra,* but is also understood more profoundly as one of the collection of duties that civilized people have come to, expect of each other and their institutions. Therefore, while the court in this situation may be perceived as "imposing" a duty, it is in truth only recognizing an obligation that, it may fairly be said, persons would widely expect ought to apply, even in the absence of a more formal judicial pronouncement. It is, after all, the extent to which our principles of jurisprudence resonate with our collective convictions and shared notions of right and wrong that ultimately lend vitality to, and command respect for, our system of laws. To fail to recognize such an obvious duty on the part of a hospital in these circumstances would, by contrast, render the common law not only effete but a legitimate object of derision.

Trial Court Opinion, 7/9/09, at 25–26.

¶ 14 Viewing the facts in a light most favorable to Appellees, as we are required to do, we conclude Appellees have established by clear, precise, and convincing facts the doctrine of fraudulent conceal-ment such that the invocation of the statute of limitations is estopped. It is now "for the jury to say whether the remarks that are alleged to constitute the fraud or concealment were made." *Fine, supra.* Hence, at this juncture, the entry of summary judgment in favor of St. Luke's on the basis of the statute of limitations defense is estopped by the doctrine of fraudulent concealment and the final disposition of this issue is for the trier of fact.

¶ 15 Order affirmed.