**SAINT LUKE'S HOSPITAL OF BETHLEHEM, Pennsylvania d/b/a St. Luke's Hospital and St. Luke's Hospital & Health Network, Appellants**

v.

**John R. VIVIAN, Jr., Esq., Martin D. Cohen, Esq., Cohen & Feeley, P.C., Dr.**

John Shane, M.D., Harry H. Miller, Executor of the Estate of Regina C. Miller, Appellees.

Saint Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital and St. Luke's Hospital & Health Network, Appellants

v.

John R. Vivian, Jr., Esq., Martin D. Cohen, Esq., Cohen & Freeley, P.C., Dr. John D. Shane, M.D., Robert E. Hall, Jr. and Leslie A. Hall, Co-executors of the Estate of Marilyn J. Hall, Deceased, Appellees.

Superior Court of Pennsylvania.

Argued May 6, 2014.

Filed Aug. 18, 2014.

Reargument Denied Oct. 15, 2014.

Arthur W. Hankin and Lewis W. Schlossberg, Philadelphia, for appellants.

Francis S. Blatcher, III, Media, for Vivian, appellee.

BEFORE: ALLEN, JENKINS, and FITZGERALD *, JJ.

OPINION BY ALLEN, J.:

St. Luke's Hospital of Bethlehem, Pennsylvania d/b/a St. Luke's Hospital and St. Luke's Hospital & Health Network, ("Appellant"), appeals from the trial court's order overruling Appellant's claims of privilege, denying a protective order in favor of Appellant, and sanctioning Appellant pursuant to a motion by John R. Vivian, Jr. Esquire ("Attorney") [1]. We affirm.

Underlying the instant litigation are various wrongful death lawsuits initiated by the families of Appellant's former patients, on the basis that one of Appellant's former nurses, Charles Cullen ("Cullen"), caused the death of their loved ones. In a prior opinion involving one of these actions, we detailed the following factual background:

> [Charles] Cullen began working as a nurse in the Coronary Care Unit (CCU) of [Appellant's hospital] on June 5, 2000. On June 2, 2002, Hospital staff found various used and unused medications improperly disposed in a receptacle for used syringes, or a "sharps" bin, in the CCU. Through its nurse manager, [Appellant] commenced an investigation by, at first, monitoring the receptacle to see if the culprit would place any more unauthorized medicines in the bin. The next day, June 3, 2002, Nurse Gerald Kimble found the box full of used and unused containers of medications, including Vecuronium and nitroprusside.

Because the authorized use of these medications could not be substantiated, and with [Appellant's] in-house counsel on administrative leave at the time, Risk Manager Jan Rader requested that outside counsel, Attorney Paul Laughlin, come to the Hospital and conduct an investigation on its behalf. Attorney Laughlin interviewed several employees, including Nurse Kimble, who informed him that Cullen had exhibited strange or quirky behavior. Attorney Laughlin did not interview Cullen at that time and left the hospital without identifying the culprit.

On June 4, 2002, at approximately 11:00 p.m., more used and unused medications were found in the sharps disposal bin in the CCU medication room. Risk Manager Rader reached Attorney Laughlin by telephone at approximately 2:00 a.m. on June 5, 2002, and expressed her concern that Cullen was to blame for the diversion of medications and that she wanted him removed from his job duties because he may have also been using those drugs to harm patients. Confronted by Attorney Laughlin, Cullen denied diverting medications but offered to resign; he was escorted from the Hospital by security. Later that day, on June 5, 2002, [Appellant] decided to accept his resignation and Cullen never returned to duty at [the hospital].

Attorney Laughlin recalls that he suggested patient charts be reviewed to ascertain whether the diverted Vecuronium had been improperly administered, thereby resulting in patient harm; however, the question of what precisely At-

---

* Former Justice specially assigned to the Superior Court.

1. Parties Martin D. Cohen, Esquire, Cohen & Feeley, P.C., Dr. John Shane, M.D., and Harry H. Miller, Executor of the Estate of Regina C. Miller are not participating in this appeal.

torney Laughlin learned during, and concluded from, his investigation is not clear. And in that respect, the deposition testimony of the various witnesses diverges considerably. Attorney Laughlin has indicated that particularized suspicion of Cullen harming patients was never brought to his attention. However, notes from his interviews in combination with the testimony of Nurse Patricia Medellin leave it within the purview of the finder of fact to draw a different inference.

Specifically, Nurse Medellin has stated she met with Attorney Laughlin on the night he confronted Cullen and that he had instructed her to call him if she "had any additional thoughts." After learning that opened containers of Vecuronium had been found in the receptacles and that other nurses had concerns that patients may have been harmed, she telephoned Attorney Laughlin on or about June 7, 2002. She informed him that the unauthorized administration of Vecuronium would be consistent with unexplained slowing down of patient heart-rates, leading to "codes" when their hearts stopped. She also told Attorney Laughlin that no one in the CCU at that time should have been receiving Vecuronium.

In response to this, however, Attorney Laughlin informed Nurse Medellin that "the investigation was closed" and that he was "confident that Cullen was not in any way harming patients." Nurse Medellin pressed Attorney Laughlin about how he could be so sure, especially when Attorney Laughlin had admitted to her that he had not compared the medications sent from the pharmacy versus those actually used on patients and had not compared the number of patient codes on day-versus night-shifts when Cullen was on duty. Attorney Laughlin allegedly responded that based on his experience as a prosecutor in Philadelphia for eight years, he was confident in his investigation and was "certain" that Cullen "was not hurting anyone." He then informed her once again that the investigation was "closed and not open . . . for further review."

Nurse Medellin has also testified at deposition that she voiced her concerns to her supervisors, but that she was met with an equally inhospitable response. In particular, she stated that after Attorney Laughlin dismissed her concerns, she spoke to the Clinical Coordinator at [the hospital], Thelma Moyer, and the CCU Nurse Manager at [the hospital], Ellen Amedeo, both of whom dismissed her concerns and informed her that the investigation was closed. She also testified that after speaking with Attorney Laughlin, she compiled a list of the patients who died in the CCU and compared it to Cullen's shifts, and determined that a disproportionate number of patients died while he was on duty. However, because of the lack of receptivity and "almost anger" expressed by Clinical Coordinator Moyer and CCU Nurse Manager Amedeo to her previous entreaties, Nurse Medellin did not present the list she compiled for fear of "repercussions." Instead, she brought the matter to the attention of a police-officer friend of hers, who, in turn, arranged an appointment with the Lehigh County District Attorney.

Other nurses, including Judy Glessner and Darla Beers, have also testified that concern was present among the nursing staff that Cullen had harmed patients, but neither of those witnesses recalled expressing any particularized concerns to Laughlin. However, Assistant Pharmacy Director Susan Reed has testified that she recalled expressing to Laughlin that the nature of the empty medications

found, including Vecuronium, raised a concern about potential patient harm. And notes Attorney Laughlin apparently took during his conversation with Nurse Medellin contain abbreviated descriptions that could be understood as references to patients being harmed by Cullen and "cod[ing] fast." Testimony from [Appellant's] Vice President of Risk Management, Gary Guidetti, indicates, however, that Attorney Laughlin never apprised him of concerns about patient harm or otherwise passed those concerns onto upper management.

After he returned from leave in July 2002, the Hospital's General Counsel, Seymour Traub, directed Attorney Laughlin to prepare a report and ordered additional chart reviews to be performed by [Appellant's] staff. General Counsel Traub testified that Attorney Laughlin never mentioned that any nurses had conveyed concerns about Cullen harming patients. Risk Manager Rader and Nursing Supervisor Koller were charged with reviewing charts of all of the patients who had died over the course of the weekend in which the diverted medications were found. However, Nursing Supervisor Koller testified at deposition that she had never before performed any similar such chart review and, in fact, was not even aware of the purpose of her review when Risk Manager Rader asked her to review the patient charts. For her part, Risk Manager Rader testified at deposition that Attorney Laughlin indicated to her at that point that he could not find "a scintilla of evidence that there was any foul play involved[.]" In any event, as a result of this review, Risk Manager Rader and Nursing Supervisor Koller identified neither any suspicious administration of Vecuronium nor any suspicious deaths. Accordingly, the additional inquiries ordered by General Counsel

Traub failed to unearth Cullen's involvement in patient deaths and, thereafter, [Appellant's] Chief Executive Officer concluded this part of the investigation by referring Cullen to the State Board of Nursing for follow up as it saw fit.

Outside the Hospital, and as a result of the meeting with Nurse Medellin, the District Attorney of Lehigh County commenced an investigation, but it bore little fruit. Working with the Pennsylvania State Police, the District Attorney retained a forensic pathologist, Dr. Isadore Mihalikis, who reviewed seventeen patient charts selected by [Appellant]. However, Dr. Mihalikis was not provided with a written list of the diverted medications and apparently had no contact with any of the nurses or their statements regarding suspicions about Cullen. Dr. Mihalikis was unable to conclude that Cullen had harmed anyone.

Notwithstanding the concerns expressed to them, as described by Nurse Medellin, neither Clinical Coordinator Moyer nor CCU Nurse Manager Amedeo informed the State Police of nurses' concerns that Cullen may have harmed patients. After notification by the District Attorney that the matter had been referred to law enforcement, [Appellant] undertook further investigations, including patient-chart review by an outside physician; however, this, too, failed to lead [Appellant] to conclude Cullen had harmed any patients.

[T]he breakthrough came in October 2003, when Cullen's subsequent employer, the Somerset Medical Center, attributed abnormal patient chemistries to Cullen's actions and fired him. Subsequently, in response to questioning by the New Jersey State Police in December of that year, Cullen confessed to having killed patients both in New Jer-

sey and in Pennsylvania. The Lehigh County District Attorney and the Hospital then reopened their investigations and Cullen ultimately confessed to killing, among others, the five decedents at issue in these cases. The estates of those decedents, however, had all been previously issued death certificates indicating causes of death consistent with the progression of the respective diseases for which the patients had been receiving treatment at [the hospital]. The Plaintiffs evidently first learned of their potential causes of action only after media reports in the wake of Cullen's confessions, which indicated that some of his deadly actions occurred during his tenure at [Appellant's hospital].

*Krapf v. St. Luke's Hospital,* 4 A.3d 642, 645–648 (Pa.Super.2010) (internal citations to the trial court opinion and the record omitted).

As to the instant appeal, the trial court set forth the following factual history and posture of the case:

[Appellant] has appealed the order entered in these consolidated cases on August 23, 2013, which overruled [Appellant's] assertion of attorney-client privilege and imposed sanctions upon [Appellant] for contumacious, obstreperous and dilatory behavior, as exhibited at deposition in these matters, which also demonstrated contempt of the order of court filed on June 24, 2013. [ ]

[Appellant] has filed suit against the various defendants asserting, *inter alia,* causes of action premised on a violation of the so-called Dragonetti Act, 42 Pa. C.S. § 8351 et seq., on the grounds that [Attorney] wrongfully used civil proceedings in bringing actions relating to patient-deaths allegedly caused by admitted serial killer, Charles Cullen, while he was employed at [Appellant's] hospital. The issue of attorney-client

privilege as an alleged basis to resist discovery in the present cases was first addressed by an order and opinion filed on February 28, 2013.

\* \* \*

With [Appellant] continuing to thwart inquiry into matters relating to legal representation in the underlying cases, [Attorney] again moved to compel discovery. On June 24, 2013, the court entered an order granting [Attorney's] motion.

\* \* \*

In derogation of the obvious import of the court's ruling, [Appellant] continued to object to legitimate inquiry into matters relating to legal services provided in the underlying cases, resulting in further motion practice. On August 23, 2013, the Court issued the ruling from which the present appeal has been taken. [ ]

Trial Court Opinion, 11/13/13, at 2–4.

Appellant and the trial court have complied with Pa.R.A.P. 1925. Appellant presents the following issues for our review:

1. Did the trial court erroneously overrule valid claims of privilege and require [Appellant's] witnesses to disclose attorney-client privileged and attorney work product protected information during depositions?

2. Did the trial court erroneously deny [Appellant's] motion for a protective order and grant in part [Attorney's] motions for sanctions, where [Appellant] demonstrated colorable and meritorious claims of privilege and other matters in its motions and [Attorney] raised no proper grounds for the entry of sanctions against [Appellant]?

3. Did the trial court erroneously prevent [Appellant] from even raising claims of privilege during depositions

absent prior approval through in camera review and/or ex parte hearing?

4. Did the trial court improperly issue findings of fact against [Appellant] involving matters not of-record nor even raised by any of the parties in their motions or responses giving rise to the Trial Court's Order?

5. Did the trial court erroneously order sanctions against [Appellant] for having filed a motion for protective order that raised colorable and meritorious claims of privilege and other matters?

6. Did the trial court erroneously and *sua sponte* order sanctions against [Appellant] arising from the deposition of [Appellant's] Chief Executive Officer, where there was no request for such sanctions and no basis for a finding that Mr. Anderson purportedly engaged in "contumacious and obstreperous behavior" during his deposition?

Appellant's Brief at 5–6.

 A non-final discovery order can be subject to appellate review pursuant to the collateral order doctrine if a "colorable claim" of the attorney-client privilege is raised. *Law Office of Douglas T. Harris, Esquire v. Philadelphia Waterfront Partners, LP*, 957 A.2d 1223, 1229 (Pa.Super.2008). We have explained:

> We are permitted to review [a] trial court's ... discovery order pursuant to the collateral order doctrine. Pa.R.A.P. 313(a) (providing that "[a]n appeal may be taken as of right from a collateral order of [a] [ ... ] lower court"). Specifically, we recognize that "discovery orders involving privileged material are [ ... ] appealable as collateral to the principal action pursuant to Pa.R.A.P. 313" because "once purportedly privileged material is divulged, the disclosure of documents cannot be undone and subsequent appellate review would be ren-

dered moot." *T.M. v. Elwyn, Inc.*, 950 A.2d 1050, 1056–1057 (Pa.Super.2008) (citations and internal quotation marks omitted); *see Berkeyheiser v. A–Plus Investigations, Inc.*, 936 A.2d 1117, 1123–1124 (Pa.Super.2007) (stating that "Pennsylvania courts have held that discovery orders involving potentially confidential and privileged materials are immediately appealable as collateral to the principal action").

*Barrick v. Holy Spirit Hospital of the Sisters of Christian Charity*, 32 A.3d 800, (Pa.Super.2011). "Whether the attorney-client privilege or the work product doctrine protects a communication from disclosure is a question of law. This Court's standard of review over questions of law is de novo, and the scope of review is plenary." *In re Thirty–Third Statewide Investigating Grand Jury*, —— Pa. ——, 86 A.3d 204, 215 (2014) (internal citations omitted). Our review of a discovery order, as well as a trial court's order imposing sanctions, requires the application of an abuse of discretion standard. *See Barrick, supra*, at 808; *see also ACE American Insurance Company v. Underwriters at Lloyds & Co.*, 939 A.2d 935, 945 (Pa.Super.2007) (internal citation omitted).

 Appellant's first, second, and third issues contend that the trial court erred in denying Appellant's motion for protective order and Appellant's privilege claims. Appellant posits:

In the motions leading up to the Trial Court's Order, [Appellant] established that [Attorney] had sought information on numerous privileged topics, including confidential communications with counsel, counsel's preparations for the filings of these actions, counsel's work product in connection with these actions, and counsel's own strategy. Nevertheless, the Trial Court denied [Appellant's] motion for protective order in its entirety

and instead proclaimed [Appellant] had not demonstrated any basis for privilege, merely because these *Dragonetti* actions seek compensation for legal fees incurred in the prior underlying *Hall* and *Miller* actions. The Trial Court's Collateral Order should be reversed because [Appellant] has demonstrated colorable and meritorious grounds for relief in its motion for protective order.

Appellant's Brief at 15. Additionally, Appellant asserts:

> The Trial Court has ruled that [Appellant] is not permitted to raise the attorney client privilege or work product doctrine as an objection to any questions during depositions without prior approval from the Trial Court. In its Order, the Trial Court specifically stated: "Nor ... is attorney-client privilege in respect to representation in the underlying matter a proper basis for objection to discovery in this action, absent approval through in camera review and/or ex parte hearing". (Ex. A at 5; R.517a). The Trial Court provides no basis for such a restriction in its Order, and its Memorandum Opinion is similarly silent as to why such an onerous and unworkable restriction (on only [Appellant]) is necessary. It is not.

Appellant's Brief at 25–26. Further, Appellant maintains that the "ruling effectively precludes [Appellant] from making any objections during depositions based on the attorney-client privilege and work product doctrine[.]" *Id.* at 26.

Initially, we recognize that Pennsylvania Rule of Civil Procedure 4012 governs motions for protective orders, and provides:

**Rule 4012. Protective Orders**

(a) Upon motion by a party or by the person from whom discovery or deposition is sought, and for good cause shown, **the court may make any order which justice requires to protect a party or person from unreasonable annoyance, embarrassment, oppression, burden or expense[.]**

Pa.R.C.P. 4012(a) (emphasis supplied).

Further, Rule 4011 states:

No discovery, including discovery of electronically stored information, shall be permitted which

(a) is sought in bad faith;

(b) would cause unreasonable annoyance, embarrassment, oppression, burden or expense to the deponent or any person or party; [or]

(c) is beyond the scope of discovery as set forth in Rules 4003.1 through 4003.6;

Pa.R.C.P. 4011(a)-(c).

Rule 4003.1 provides in pertinent part:

(a) Subject to the provisions of Rules 4003.2 to 4003.5 inclusive and Rule 4011, **a party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party,** including the existence, description, nature, content, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.

(b) **It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.**

(c) **Except as otherwise provided by these rules, it is not ground for objection that the information sought involves an opinion or contention that relates to a fact or the application of law to fact.**

*Note:* Interrogatories that generally require the responding party to state the basis of particular claims, defenses or contentions made in pleadings or other documents should be used sparingly and, if used, should be designed to target claims, defenses or contentions that the propounding attorney reasonably suspects may be the proper subjects of early dismissal or resolution or, alternatively, to identify and to narrow the scope of claims, defenses and contentions made where the scope is unclear.

Pa.R.C.P. 4003.1(a)-(c) (emphasis supplied).

Privileged evidence relating to an attorney's work is addressed in Rule 4003.3:

Subject to the provisions of Rules 4003.4 [discovery of statements] and 4003.5 [expert discovery], a party may obtain discovery of any matter discoverable under Rule 4003.1 even though prepared in anticipation of litigation or trial by or for another party or by or for that other party's representative, including his or her attorney, consultant, surety, indemnitor, insurer or agent. **The discovery shall not include disclosure of the mental impressions of a party's attorney or his or her conclusions, opinions, memoranda, notes or summaries, legal research or legal theories.** With respect to the representative of a party other than the party's attorney, discovery shall not include disclosure of his or her mental impressions, conclusions or opinions respecting the value or merit of a claim or defense or respecting strategy or tactics.

Pa.R.C.P. 4003.3 (emphasis supplied).

As to the attorney-client privilege, we recognize:

In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa.C.S.A. § 5928. This codification was expanded by our Supreme Court, and now "in Pennsylvania, the attorney-client privilege operates in a two-way fashion to protect confidential client-to-attorney or attorney-to-client communications made for the purpose of obtaining or providing professional legal advice." *Gillard v. AIG Ins. Co.,* 609 Pa. 65, 15 A.3d 44, 52 n. 8 (2011).

We have explained:

Pennsylvania law imposes a shifting burden of proof in disputes over disclosure of communications allegedly protected by attorney-client privilege. The party invoking a privilege must initially "set forth facts showing that the privilege has been properly invoked; then the burden shifts to the party seeking disclosure to set forth facts showing that disclosure will not violate the attorney-client privilege, e.g., because the privilege has been waived or because some exception applies." *Nationwide Mut. Ins. Co. v. Fleming,* 924 A.2d 1259, 1266 (Pa.Super.2007) (citations omitted), *aff'd,* 605 Pa. 468, 992 A.2d 65 (2010). Accordingly, "[i]f the party asserting the privilege does not produce sufficient facts to show that the privilege was properly invoked, then the burden never shifts to the other party, and the communication is not protected under attorney-client privilege." *Id.* at 1267.

Four elements must be satisfied in order to invoke successfully the protections of attorney-client privilege:

1) The asserted holder of the privilege is or sought to become a client.

2) The person to whom the communication was made is a member of the bar of a court, or his subordinate.

3) The communication relates to a fact of which the attorney was informed by his client, without the presence of strangers, for the purpose of securing either an opinion of law, legal services or assistance in a legal matter, and not for the purpose of committing a crime or tort.

4) The privilege has been claimed and is not waived by the client.

*Id.* at 1264 (citations omitted).

*Custom Designs and Mfg. Co. v. Sherwin–Williams Co.,* 39 A.3d 372, 376 (Pa.Super.2012).

Mindful of the foregoing precepts, we examine the trial court's August 23, 2013 Order, and Appellant's invocation of the protections of the attorney-client privilege and the work product doctrine. Providing relevant context for our analysis, is the February 8, 2013 hearing relative to Attorney's motion to compel discovery from Appellant. During the hearing, Attorney's counsel argued:

[T]his is a Motion to Compel Discovery filed against [Appellant]. It's based upon written discovery, Interrogatories, Requests for Production of Documents on [Appellant]. [Appellant] responded, and [Appellant] objected-filed an objection or a response subject to objection, to every interrogatory but two, and every request for production, I think, but one. [ ]

This is a Dragonetti claim that they brought. In addition to the Dragonetti claim, they brought a conspiracy claim, a Rico Claim, and an abuse of process claim against [Attorney].

Their claims have some very serious allegations against my client of improper conduct, of conspiracy to commit perjury, of an improper and elicit [sic] payment scheme with an expert witness. I mean, they are very serious allegations against [Attorney].

Our discovery asked in part to provide us with information that you had at the time you filed your lawsuit, that you have now, and that you will present at trial, with regard to these allegations. [ ]

Well, Your Honor, they filed the lawsuit. We should know what evidence they had, if any, at the time of the lawsuit. All we're asking for is, if you claim it's a privilege, give us a privilege log. Tell us what is privileged ... Tell us if you have any information.

We just want a clear, concise response, not subject to objection. Tell us that you have information. If you don't have information, tell us you don't have any information at this point. Tell us discovery is ongoing, but let us know what you have.

N.T., 2/8/13, 3–5.

Appellant's counsel responded that Attorney's interrogatories were "contention interrogatories," which Attorney prematurely filed "because it's not fair to force a Plaintiff to tell you everything they have, before discovery is completed." *Id.* at 11. Appellant acknowledged that "we have objected to certain things. Who knew about certain things? Well, certain things are attorney-client privilege." *Id.* at 13.

In denying Appellant's invocation of privilege in that instance, the trial court explained:

The objections to Interrogatory Nos. 1–4; 6–14; 16–26 on the grounds of, *inter alia,* relevance, burdensomeness, and/or vagueness are overruled. Each question appears reasonably calculated to lead to the discovery of admissible evidence in relation to the claim for damages in the form of attorneys' fees incurred in the underlying actions, upon which the present wrongful-use-of civil proceedings claims are premised. Although [Appellant] has provided answers notwith-

standing the objections, to the extent those answers remain incomplete as a result of the objections, [Appellant] shall supplement its responses within twenty (20) days of the entry of this order. Further, if [Appellant] maintains its objections on the basis of privilege, it shall specifically state the basis for any information withheld pursuant thereto, so that an in-camera inspection or ex parte hearing thereon may be held. It will be noted, however, that the attorney-client privilege in respect to the completed underlying actions that forms the basis for the present claims are waived to the extent that information relevant to the claims of attorneys' fees, including the reasonableness thereof are at issue in this proceeding.

Trial Court Order, 2/28/13, at 6.

In a subsequent opinion, the trial court further explained:

[Attorney] move[s] to compel production of legal bills that serve as the basis for [Appellant's] claim of damages in these actions brought pursuant to the so-called Dragonetti Act, 42 Pa.C.S. § 8351 et seq., which, in turn, stem out of underlying litigation that had been brought by [Attorney] in relation to [Appellant's] employment of admitted serial killer Charles Cullen. [Appellant] attempts to rely on *Levy v. Senate of Pennsylvania* [619 Pa. 586], 65 A.3d 361 (Pa.2013), to avoid the import of this court's previous ruling regarding the discoverability of information relevant to claims for attorney's fees, as set forth in the opinion filed on February 28, 2013. Hardly on all fours with the present matter, as [Appellant's] counsel initially represented at oral argument, *Levy* concerned the applicability of the attorney-client privilege to a Right–to–Know–Law request made by a third-party journalist. *Id.* at 363. It is thus readily distinguishable

from the case at hand which involves an affirmative demand by a plaintiff for attorney's fees on the basis of the alleged reasonableness of the very legal work it would simultaneously purport to be protected by a privilege.

Plainly, there is no meaningful opportunity for an adversary, let alone a factfinder, to assess the reasonableness of requested fees without an examination of the substantive content of the billing entries. *See, e.g., Ideal Electronic Sec. Co., Inc. v. International Fidelity Ins. Co.,* 129 F.3d 143, 151–52 (D.C.Cir.1997) (applying common-law doctrine of implied waiver to claim of attorney's fees in respect to resolved underlying case and holding that a party will not be permitted to partially disclose allegedly privileged information in support of its claim against another and then assert privilege as basis for withholding from opponent the remainder of information necessary to defend against the claim). Further, the ostensible examples of sensitive attorney-client communications contained in the redacted materials proffered by [Appellant's] counsel at oral argument—such as references to conferences with experts or summations of expert reports—prove wholly undeserving of protection as sensitive attorney-client communications and amount, at best, to examples of work-product. It would appear to be self-evident that such work-product in respect to an underlying action upon which a Dragonetti claim is premised cannot be immune from discovery when reimbursement for that very activity constitutes the basis for the damages being alleged. *See ibid.* If, in fact, there are sensitive attorney-client communications present in the billing records that are not relevant to a fair assessment of the reasonableness of the fees being claimed, [Appellant], as a proponent of the privilege,

may file a detailed motion for a protective order pursuant to Pa.R.C.P. 4012, identifying with particularity the exact communications subject to the privilege; otherwise, it shall produce unredacted copies of the requested legal bills within twenty (20) days of the entry of this order or be subject to sanctions upon [Attorney's] subsequent application to the court.

Trial Court Order, 6/24/13, at 2 n. 1.

On July 19, 2013, the trial court heard arguments regarding Appellant's "renewed motion for protective order[2] arising out of the two depositions that have occurred to date, taken by [Attorney.]" N.T., 7/19/13, at 3. Appellant stated that "[t]his renewed motion was necessitated by the extraordinary number of inappropriate and irrelevant questions that were asked during these two depositions, both of which were not able to be finished, and have therefore been continued. And what we are asking the Court for today is a renewed motion for protective order to try to lend some guidance so that we keep the issues focused on these cases." *Id.* at 3–4. Specifically, Appellant's counsel complained:

The issues that were brought up during the deposition of [Appellant's] C.E.O., Richard Anderson, involved just an extraordinary number of topics, such as the—inner workings of the Board of Directors of [Appellant's hospital], whether emergency meetings were taking place, every individual who ever attends these meetings, what all the committees of the board meetings are. These would go . . . on and on for hours. And that's just one segment among many.

Another topic that was explored in great detail were insurance and regulatory matters on behalf of the hospital, all

of the inner workings of the in-house legal department, how they handled claims. None of these issues even conceivably bear on the claims and defenses that are actually at issue in this case.

*Id.* at 4. Appellant's proposed order mandated that "[Attorney] cannot ask any questions that seek information protected by the attorney-client, and/or work product privilege." *Id.* at 10.

Attorney's counsel countered:

Counsel is correct that this is a renewal of their prior motion, the motion that they came to Court, and admitted was premature after making us come to Court, argue in Court, and they said it's premature. You are right. We are going to withdraw it.

So we all went home and did the depositions as we were told to do. Your Honor admonished them at that time, and warned them that there are no motions in limine for depositions during discovery.

The questions that we asked during the depositions of Mr. Hankin and Mr. Anderson, were directly related to the instant matter, the basis that—or [Appellant's] claims against [Attorney], for the outlandish allegations that they have made against him. In doing so, we had no choice but to go into the underlying actions in this matter, which were the Hall & Miller actions. And going into some of the investigation that was done in that case.

*Id.* at 9. Attorney's counsel averred that the questions were relevant, and explained:

[E]arly on in the underlying litigation [Mr. Hankin wrote a letter to Attorney stating] . . . there is no relatedness be-

---

**2.** Appellant's original presentation of the motion for protective order was withdrawn dur-
ing oral arguments regarding same. N.T., 7/19/13, at 5.

tween [the Hill and Miller] death[s] and [Cullen]. Therefore, your actions are frivolous; brought in bad faith, and for an improper purpose, . . . And my client has been damaged, and we seek the right to pursue a wrongful use [of process claim], and any other claim against your client if you don't withdraw [the underlying Hill and Miller litigation].

\* \* \*

Mr. Anderson testified in his deposition that he relied on the advice of counsel, and the representations that they made to him, for his belief that these actions were without merit, baseless, and for an improper purpose.

So, Mr. Hankin's letter is crucial to this case. It's crucial in the statute of limitations case. We would like to know what information he had to make the representations that he did in that . . . letter, that my client should withdraw the lawsuit.

*Id.* at 11–12.

Attorney argued:

[Appellant] put Mr. Hankin in the position of a fact witness in this matter, by mentioning the Hankin letter, and by referring to it in their complaint, and by attaching the letter as an exhibit in their complaint.

Yet when we took Mr. Hankin's deposition, [Appellant's counsel] represented him, [and] every single question I asked, objection, work product, objection attorney-client privilege. They wouldn't even give me the name of a witness. They would give me nothing. Everything was subject to objection. That is why we were there for so long.

Every single question I asked, I got very little. I got, objection, objection, objection. And I got work product, work product, work product. Because he was the attorney in the underlying

case, we don't have to tell you the basis. We don't have to tell you what investigations he did to determine that Mrs. Hall and Mrs. Miller were very sick individuals.

The depositions of Mrs. Hall's family, and Mrs. Miller's family occurred two days before Mr. Hankin's deposition. In both of those depositions [taken by Appellant], family members . . . testified.

They disagreed with representations that were made in the letter. They were both told mom will be coming home, or my wife will be coming home in a couple of days. Next thing they know, their loved one is dead. [ ]

So there are some factual issues. So where did Mr. Hankin get that information that he put in his letter, Mrs. Hall and Mrs. Miller are gravely ill? . . . There had been no discovery done in the underlying actions. The case had been stayed.

So where did he get this information to tell my client, you better withdraw your lawsuit? We are entitled to, you know, look into that a little bit. It's related to this issue.

With regard to Mr. Anderson, Mr. Anderson testified he is President and C.E.O. of [Appellant's hospital]. The buck stops with him. He is in charge. He knows what every—You know, he has direct knowledge of—or indirect knowledge, through his staff, of everything that goes on, including the underlying actions, and the instant action.

They were identifying him also as one of the corporate designees in this matter. So when I—Given his position, I have to delve into, well, if you don't have information, then who would have the information? Therefore, I have to go into, what is your structure? You said you had—He testified he had a staff. My staff might take care of that. Well,

who would your staff be? I had to ask those questions so that I can find out other witnesses.

See, they can't say to me, I don't handle that, my staff does. I'm not going to give you the name of my staff. And if you ask questions about my staff, then you are asking about the inner workings of the hospital, and you can't do that.

*Id.* at 13–16.

In its August 23, 2013 Order denying Appellant's motion for protective order and claims of privilege, the trial court reasoned:

In 2004, [Attorney] initiated actions on behalf of the estates of Marilyn J. Hall, Lehigh County No. 2004–C–2052V, and Regina C. Miller, Lehigh County No. 2004–C–2048V, alleging wrongful death and survivor claims against [Appellant] based on theories of corporate negligence and medical malpractice. [ ] In those underlying actions, [Attorney] alleged Cullen had … caused the deaths of Hall and Miller. [Appellant's] motion for summary judgment was granted by order dated June 30, and filed on July 1, 2009. The Superior Court affirmed on June 30, 2010.

In these actions, [Appellant] contends those underlying actions were "patently frivolous" and "only brought for the improper purpose of extracting an unjust settlement from [Appellant]." ( [Appellant's] Memorandum of Law in Support of its Renewed Motion for Protective Order, filed on July 12, 2013, at p. 8.) Specifically, it alleged the initiation and continuation of those underlying actions, and a conspiracy to do so, were violations of various state and federal laws, *to wit,* wrongful use of civil proceedings, 42 Pa.C.S. § 8351 ("Dragonetti Act"); abuse of process; fraudulent misrepresentation; and civil conspiracy, 18

U.S.C. § 1962(a)-(d) ("Racketeer Influenced and Corrupt Organizations Act").

\* \* \*

In order to prevail on its claim under the Dragonetti Act, [Appellant] has to establish [Attorney] in initiating or continuing a civil proceeding acted (1) in a grossly negligent manner or without probable cause and (2) did so primarily for a purpose other than that of securing proper discovery, joinder of parties or adjudication of the claim in which the proceedings were based. 42 Pa.C.S. § 8351.

In their Memorandum of Law in Support of their Renewed Motion for Protective Order, [Appellant] asserts the underlying actions were frivolous because Hall and Miller were in severely compromised health when they entered [Appellant's hospital]; Cullen denied having killed them; the coroner's reports and official certificates of death represented their deaths to have been from natural causes; investigations by the Pennsylvania State Police and the District Attorney of Lehigh County concluded neither Hall nor Miller were harmed by Cullen; the certificates of merit [Attorney] obtained were flawed; and the expert retained on behalf of Hall and Miller was unable to conclude within a reasonable degree of medical certainty that either Hall or Miller had been harmed by Cullen.

[Attorney] [was] under no obligation to accept at face value Cullen's denial of culpability, the causes of death listed on the coroner's reports and death certificates, or the conclusions reached by the Pennsylvania State Police or the District Attorney in initiating or pursing their litigation. Indeed, Cullen was an admitted mass murderer, and, as has been revealed in other litigation involving Cullen, death certificates and investiga-

tions by the State Police and the District Attorney provided no basis to charge Cullen with any criminal conduct with respect to other patients until he actually admitted to having caused the death of those other patients. Furthermore, at this stage of the litigation it is unclear to what extent, if at all, a public statement issued by [Appellant] misrepresenting the conclusions of an internal study by [a physician] may have played in [Attorney's] decisions to initiate or continue the underlying litigation.

Discovery has broken down. The court addressed interrogatories in an order and opinion dated February 27, and filed on February 28, 2013, and the production of documents and the issue of attorney-client and work-product privilege in an order dated June 21, [2013], and filed on June 24, 2013. Now the parties return to court to address, among other things, issues pertaining to oral depositions.

Counsel for [Attorney] describes the situation as follows:

> [Appellant] has and continues to engage in obstreperous behavior to prevent [Attorney] from obtaining discovery in this matter. This includes: 1) only providing responses to discovery after being compelled to do so; 2) engaging in dilatory tactics when asked to assist in identifying witnesses and scheduling depositions; 3) trying to control the order and location of depositions; 4) filing a frivolous motion for protective order, conceding in open court the motion was improper but withdrawing the motion only after forcing the parties to come to court and present oral argument; 5) making witnesses available only for partial days; 6) engaging in obstreperous behavior at deposition, including objecting to almost every question asked, making speaking and coaching objections, instructing witness not to answer; 7) picking fights at deposition and then walking out; and 8) filing the instant frivolous motion for protective order.

([Attorney's] Response in Opposition to [Appellant's] Motion for Protective Order and Counter–Motion for Sanctions and Motion to Preclude Evidence at Trial, at p. 7.) A review of the record and the partial depositions of Messrs. Hankin and Anderson indicates that at least some of [Attorney's] characterizations are not without foundation.

Inasmuch as it, as yet, remains unclear to what extent the credibility of [Appellant] may be at issue at trial in this matter, it cannot be said that discovery into [Appellant's] personnel's contemporaneous knowledge of the events giving rise to the underlying litigation and inquiry into the institution's internal mechanisms concerning such knowledge and communications related thereto are not reasonably calculated to lead to admissible evidence. *St. Luke's v. Shaughnessy,* slip op. at 332–41 (Leh, C.P. 2013) <http://opinionsiccpa.org/PDFs/OPS40/LCCPAOP769895388.pdf>. Nor, as indicated in the orders and opinions entered in these matters on February 28, 2013, and June 24, 2013, is attorney-client privilege in respect to representation in the underlying matter a proper basis for objection to discovery in this action, absent approval through in camera review and/or ex parte hearing. No basis for application of the privilege has been demonstrated in [Appellant's] motion. Accordingly, the various lines of questioning pursued thus far by Defense counsel were not improper and a protective order will not issue.

Trial Court Order, 8/23/13, at 3 n. 1.

The trial court further observed in its Pa.R.A.P. 1925(a) Opinion that its August

23, 2013 "footnote opinion ... reiterate[ed] that attorney-client privilege provides no basis to object to discovery **into matters fairly related to reasonableness, *vel non,* of legal fees being claimed as damages in the present actions**[.]" Trial Court Opinion, 11/13/13, at 7 (emphasis supplied).

■ Accordingly, while Appellant extrapolates from the trial court's denial of privilege that the trial court has effectively stripped Appellant of viable protections forevermore, we are not persuaded that the trial court's mandate was so far reaching. The trial court emphasized "that attorney-client privilege provides no basis to object to discovery **into matters fairly related to reasonableness, *vel non,* of legal fees being claimed as damages in the present actions**[.]" *Id.*

Further, while Appellant contends that the trial court is denying Appellant's privilege claims without a careful review of Appellant's basis for the asserted privilege claims, the record reflects that the trial court has addressed the privilege claims multiple times, and has denied them after careful deliberation, and after scrutinizing the testimony received in the action to date. Indeed, the trial court expressly found that "the various lines of questioning pursued thus far by Defense counsel were not improper." Trial Court Order, 8/23/13, at n. 1.

Additionally, Appellant summarily contends it has met all of the elements to invoke the attorney-client privilege "regarding the communications over which [Appellant] has claimed privilege" because "[t]he matters all relate to confidential communications between [Appellant] and it's counsel, for the purposes of securing legal advice, concerning the underlying *Hall* and *Miller* actions, as well as the present *Dragonetti* actions, and the privilege has not been waived." Appellant's Brief at 18–19 *referencing Custom De-*

*signs,* 39 A.3d at 376. We cannot agree. Significantly, a contentious portion of the sworn testimony involved Attorney's counsel's inquiries regarding, *inter alia,* Appellant's counsel's letter to *other attorneys—* the Hankin letter, for which there would be no protection.

Likewise, we do not find that the trial court erred in denying Appellant's motion for a protective order. The record supports the trial court's determination that Appellant's witnesses should not be protected from answering questions concerning the work for which attorney's fees are sought as damages, and from answering questions that are germane to the credibility of Appellant's personnel, and Appellant's knowledge, by and through its staff and agents, of Cullen's employment, supervision, and the investigation regarding his criminal behavior while Cullen was employed by Appellant.

Moreover, Appellant discounts that Anderson was produced by Appellant as a corporate designee regarding "[Appellant's] claim for damages of forced disruption to its business activities, [Appellant's] claim that it suffered injury in its business in providing health care services, and [Appellant's] claim that it suffered injury to its business including harm to its reputation." N.T., 6/26/13, at 7. Such damage claims, their basis, and their reasonableness are fair areas of inquiries by Attorney that Appellant cannot seek to claim in plenary fashion, but then cloak in privilege.

In *In re Thirty–Third Grand Jury Investigation,* 86 A.3d 204 (Pa.2014), our Supreme Court explained:

> The attorney-client privilege is intended to foster candid communications between counsel and client, so that counsel may provide legal advice based upon the most complete information from the client. [*Com. v.] Chmiel* [558 Pa. 478],

738 A.2d [406,] 425 [ (1999) ]; *see also Levy [v. Senate of Pennsylvania,* 619 Pa. 586], 65 A.3d [361,] 371 [ (2013) ] (purpose of privilege is to encourage clients to provide information freely to their attorneys so attorneys can give sound and informed advice). The central principle is that a client may be reluctant to disclose to his lawyer all facts necessary to obtain informed legal advice, if the communication may later be exposed to public scrutiny. *Chmiel,* 738 A.2d at 425. "Recognizing that its purpose is to create an atmosphere that will encourage confidence and dialogue between attorney and client, the privilege is founded upon a policy extrinsic to the protection of the fact-finding process. The intended beneficiary of this policy is not the individual client so much as the systematic administration of justice which depends on frank and open client-attorney communication." *Investigating Grand Jury of Philadelphia County* [527 Pa. 432], 593 A.2d [402,] 406 [ (1991) ] (internal citations omitted).

*Thirty–Third, supra,* at 216–217.

The *Thirty–Third* Court reiterated its recognition in *Gillard* that there is an "ongoing tension between the two strong, competing interests-of-justice factors in play [when the attorney client privileged is invoked]—namely—the encouragement of trust and candid communication between lawyers and their clients, ... and the accessibility of material evidence to further the truth-determining process. As a result of this tension, courts have recognized exceptions to the attorney-client privilege." *Id.,* at 217 (internal citation omitted).

Indeed, the *Gillard* Court observed:

Appellants and their *amici* do appreciate that there are well-recognized limits and exceptions to the attorney-client privilege, including the central require-ment that protected communications be for the purpose of securing or providing professional legal services. Thus, they acknowledge, the privilege does not extend to business advice or protect clients from factual investigations. *See Upjohn,* 449 U.S. at 395–96, 101 S.Ct. at 685–86. Exceptions include the crime-fraud exception. *See Investigating Grand Jury,* 527 Pa. at 441–42, 593 A.2d at 406–07. Appellants and their *amici* also recognize the need for courts to guard against the possibility of abuse. *See generally* Brief for *Amici* Ass'n of Corporate Counsel, *et al.* at 10–11 n. 5 ("Nothing in this brief should be construed as an endorsement of any practice, either by outside or in-house counsel, of failing to provide legitimate discovery through an overbroad interpretation of the privilege or of failing to timely or adequately identify claimed privileged documents that have been withheld from discovery.").

*Gillard,* 15 A.3d at 52. Moreover, the Court explained that while the attorney-client privilege and the work product doctrine "overlap, they are not coterminous." *Id.,* at 59.

In examining the work product doctrine contained in Rule 4003.3, we have observed:

According to the explanatory comment accompanying Pa.R.C.P. 4003.3, "[t]he Rule is carefully drawn and means exactly what it says." *Id.,* Explanatory Comment at ¶ 3. "The underlying purpose of the work-product doctrine is to shield the mental processes of an attorney, providing a privileged area within which he can analyze and prepare his client's case. The doctrine promotes the adversary system by enabling attorneys to prepare cases without fear that their work product will be used against their clients." *T.M. v. Elwyn, Inc.,* 950 A.2d

1050, 1062 (Pa.Super.2008), *quoting Gocial v. Independence Blue Cross,* 827 A.2d 1216, 1222 (Pa.Super.2003) (citations and quotation marks omitted). Thus, Pa.R.C.P. 4003.3 specifically "immunizes the lawyer's mental impressions, conclusions, opinions, memoranda, notes, summaries, legal research and legal theories, **nothing more.**" *Id.,* Explanatory Comment at ¶ 3 (emphasis added).

This Court, however, has recognized that "the work-product privilege is not absolute and items may be deemed discoverable if the 'product' sought becomes a relevant issue in the action." *T.M., supra* at 1062, *quoting Gocial, supra* at 1222. Importantly, the explanatory comment reveals that this limited exception to the work-product doctrine only pertains to situations when an attorney's work product itself becomes relevant.

> There are, however, situations under the Rule where the legal opinion of an attorney becomes a relevant issue in an action; for example, an action for malicious prosecution or abuse of process where the defense is based on a good faith reliance on a legal opinion of counsel. The opinion becomes a relevant piece of evidence for the defendant, upon which defendant will rely. The opinion, even though it may have been sought in anticipation of possible future litigation, is not protected against discovery. A defendant may not base his defense upon an opinion of counsel and at the same time claim that it is immune from pretrial disclosure to the plaintiff.
>
> As to representatives of a party, and sometimes an attorney, there may be situations where his conclusions or opinion as to the value or merit of a claim, not discoverable in the original litigation, should be discoverable in

subsequent litigation. For example, suit is brought against an insurance carrier for unreasonable refusal to settle, resulting in a judgment against the insured in an amount in excess of the insurance coverage. Here discovery and inspection should be permitted in camera where required to weed out protected material.

Pa.R.C.P. 4003.3, Explanatory Comment at ¶ 4–5. Thus, as the comment makes clear, documents ordinarily protected by the attorney work-product doctrine may be discoverable if the work product itself is relevant to the underlying action. *Id.* The work-product privilege contained within Pa.R.C.P. 4003.3 cannot be overcome, however, by merely asserting that the protected documents reference relevant subject matter. *Id.* Rather, to overcome the work-product privilege, either an attorney's mental impressions, conclusions, opinions, memoranda, notes, summaries, legal research or legal theories must be directly relevant to the action. *Id.*

*Barrick v. Holy Spirit Hospital of the Sisters of Christian Charity,* 32 A.3d 800, 811–812 (Pa.Super.2011) *affirmed* —— Pa. ——, 91 A.3d 680 (2014).

In *Barrick,* we denied discovery of correspondence between appellant and its expert witness based on the work product doctrine by finding that:

> Although the work-product doctrine is not absolute, we noted above that the privilege only surrenders to the need for discovery when the attorney's work product itself becomes relevant to the action. Pa.R.C.P. 4003.3, Explanatory Comment at ¶ 4–5. Here, unlike the examples in the explanatory comment accompanying Pa.R.C.P. 4003.3, the correspondence is only relevant because of the subject matter discussed between

Appellants' counsel and Dr. Green. The correspondence itself is not relevant to this action. In stark contrast to the examples in the explanatory comment, Appellants' action relies upon the opinions and analyses of the expert witness, not those of their attorneys. *Id.* (providing examples illustrating that attorney work product "is not protected against discovery" where a party's claim or defense relies upon the opinion of its attorney).

*Barrick, supra,* at 813. (emphasis in original).

Here, a review of the record *in toto* reflects that Appellant repeatedly invoked the attorney-client privilege and the protection of the work product doctrine to withhold materials, such as legal invoices, and to prevent its current and former legal counsel as well as corporate designees from being deposed. We have recognized:

It is well settled that a hospital staff member or employee has a duty to recognize and report abnormalities in the treatment and condition of its patients. [ . . . ] A hospital is properly charged with constructive notice when it "should have known" of the patient's condition. Furthermore, constructive notice must be imposed when the failure to receive actual notice is caused by the absence of supervision. We interpret "failure to enforce adequate rules and policies" as an analog to "failure to provide adequate supervision."

*Brodowski v. Ryave,* 885 A.2d 1045, 1057 (Pa.Super.2005) (*en banc*), *appeal denied,* 587 Pa. 680, 897 A.2d 449 (2006).

*Krapf,* 4 A.3d 642, 653 (Pa.Super.2010). We determined that "[t]he facts of record provide a basis for the application of constructive notice on the part of [Appellant]." *Id.* In this case, the trial court reasoned that neither the attorney-client privilege nor the work product doctrine applied to Appellant's legal invoices because the very nature of the *Dragonetti* action Appellant instituted sought attorney fees expended by Appellant in defending the Hall and Miller litigations. Further, the trial court's denial of privilege following its review of the deposition testimony secured thus far correctly determined that the lines of questioning by Attorney were not improper. As Attorney's counsel argued, the information sought was discoverable, germane, and was at issue, based on, *inter alia,* Appellant's allegations within the complaint, the multiple theories of recovery against Attorney, and deponents' testimony.

Appellant's fourth issue contends:

[T]he Trial Court made findings of fact against [Appellant] that were not addressed, nor even mentioned, in any of the parties' briefs. They were not at all discussed during oral argument on the motions giving rise to the Order, were made in absence of any evidentiary hearing, and occurred while these matters are still in the discovery phase of litigation. Specifically, the Trial Court stated in its Order: "at this stage of the litigation it is unclear to what extent, if at all, a public statement issued by [Appellant] **misrepresenting the conclusions of an internal study by [a physician]** may have played in [Attorney's] decisions to initiate or continue the underlying litigation." Because there is no basis in the record for these findings of fact, and because they were not addressed by any party in the motions or argument leading up to the Trial Court's Order (and made while these cases are still in discovery), the findings of fact are unwarranted and should be vacated.

Appellant's Brief at 28 (emphasis in original). Appellant's assertion is without merit. A plain reading of the challenged "findings" reflects that the trial court

made no factual determinations at all. Rather, the trial court qualified its statements by stating it was "unclear to what extent, if at all" Appellant's public statement affected the prosecution of the underlying litigation. *Id.* (emphasis supplied). We therefore decline Appellant's exhortation to vacate the order, and will not disturb the language of the trial court's August 23, 2013 Order.

■ Interspersed within Appellant's second issue, and more fully raised in Appellant's fifth and sixth issues, Appellant challenges the trial court's imposition of sanctions. In sanctioning Appellant, the trial court explained:

> Further, in view of the contumacious and obstreperous behavior exhibited by [Appellant's] Chief Executive Officer Richard A. Anderson at deposition held on June 26, 2013, he shall be required to resubmit himself for plenary deposition by all Defendant's counsel, with no objection being lodged by [Appellant] on the grounds that any question posed at said deposition has already been asked and answered at the previous, aborted deposition. Nor shall any motion for protective order based on the duration of the deposition be entertained in the absence of said deposition lasting for more than two days as specified in the body of this order. Defendants' counsel are hereby directed to submit an itemized petition setting forth counsel fees and expenses incurred in the previous deposition as well as fees and expenses incurred in responding to, and appearing for, argument on [Appellant's] motion for protective order. Finally, Defendants, as parties, are permitted to continue to attend depositions, but shall maintain proper decorum at all times.
>
> Counsel and the parties are encouraged to move expeditiously, and with civility, to complete discovery and prepare for trial. The failure to do so will result in further order of court, including the imposition of additional sanctions as may be deemed appropriate.

Trial Court Opinion, 8/23/13, at 3 n. 1.

In its Pa.R.A.P. 1925(a) Opinion, the trial court emphasized:

> [The trial court] awarded attorney's fees as a sanction for the outrageous behavior of [Appellant's] C.E.O. Richard Anderson, who threatened [Attorney] with physical violence at deposition. (*See* Defs. June 17, 2013 Answer and Counter Motion for Sanctions, Ex. E (reproducing Dep. Testimony of Richard A. Anderson, 6/26/2013, at 163–167).) Both the baseless reassertion of attorney-client privilege and the wholly unacceptable behavior of [Appellant's] CEO necessitated a rescheduling of the deposition proceedings, warranting an award of counsel fees to their adversaries who have been improperly inconvenienced.

Trial Court Opinion, 11/13/13, at 7.

"Generally, courts are afforded great discretion in fashioning remedies or sanctions for violations of discovery rules and orders." *City of Philadelphia v. Fraternal Order of Police Lodge No. 5 (Breary)*, 604 Pa. 267, 985 A.2d 1259, 1269 (2009) (internal citations omitted). Moreover, "in ... exercis[ing] judicial discretion in formulating an appropriate sanction order, the court is required to select a punishment which 'fits the crime.'" *Estate of Ghaner v. Bindi*, 779 A.2d 585, 590 (Pa.Super.2001) (internal citation omitted). Here, the record reflects that rather than prejudice, bias, or ill will, the trial court has routinely exercised admirable judicial temperament towards the litigants in this challenging litigation.[3] Further, the sanc-

---

**3.** We agree with the trial court's assessment that "the problem that bedeviled all of us with

tions are supported by the record, and are a fitting response to Appellant's behavior as delineated by the trial court above. Accordingly, we will not reverse the trial court's imposition of sanctions.

Order affirmed.

the Cullen cases, is the multiple—is the number of cases, the complexity of the cases, and some of the collateral issues that we have had to deal with as the litigation has gone on. I mean, you know, in the history of jurisprudence, these Cullen cases are really a unique set of circumstances." N.T., 9/23/11, at 23–24.